IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO.  22-CR-40007-JPG |
| | ) | |
| MICHAEL E. PIERCE, | ) | |
| | ) | |
| Defendant. | ) | |

## RESPONSE TO MOTION TO WITHDRAW PLEA AND DISMISS INDICTMENT

The defendant, Michael Defendant ("Defendant") has filed a combined Motion to Withdraw Plea and Dismiss Indictment, ECF 53. Defendant alleges he is entitled to the requested relief, based on the Memorandum and Order from another judge in this district in *United States v. Taylor*, 23-CR-40001, 2024 WL 245557 (SD IL January 22, 2024). Defendant argues that the court's reasoning in *Taylor* is persuasive and that this Court should follow it. He urges this Court to  declare that the charge to which he pled guilty, 18 USC § 922(g)(1), is unconstitutional under the Second Amendment and *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). ECF 27.  This Court should deny the combined motion. Defendant's motion to dismiss fails because § 922(g)(1) is Constitutional.  Because of that fact, Defendant cannot show a fair and just reason to withdraw his guilty plea. This memorandum will first address the Constitutionality of § 922(g(1) before concluding that Defendant is not entitled to withdraw his guilty plea.

## I. INTRODUCTION

A grand jury charged Defendant in an Indictment with one count of being a convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). ECF 1.

1

Defendant pled guilty to that offense on July 13, 2023. ECF 37. Defendant now contends that under *Bruen*, § 922(g)(1) violates the Second Amendment. ECF 53. Defendant maintains that § 922(g)(1) is unconstitutional, "both facially and as applied." *Id.* at 5.[1] This Court should deny Defendant's combined motion and hold that Defendant is not entitled to dismissal of his indictment because: (1) the plain text of the Second Amendment does not presumptively protect the right of felons to possess firearms; and (2) even if felons are part of the people protected under the Second Amendment, § 922(g)(1) nevertheless remains constitutional, as applied to all felons, because it "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. This Court should then deny Defendant's request to withdraw his guilty plea because he cannot state a fair and just reason for doing so.

## II. FACTUAL BACKGROUND AND
## DEFENDANT'S PRIOR CRIMINAL HISTORY

On September 17, 2021, at about 1:00 in the morning, Trenton Harrison, a Marion Police Department officer observed two motorcycles traveling eastbound on West DeYoung Street in Marion. *Change of Plea Hearing Transcript* at 7. It appeared that the motorcycles were traveling at a high rate of speed. *Id.* Officer Harrison attempted to get behind the motorcycles, and they ultimately fled. *Id.* The riders accelerated away, disregarding stop signs, driving through fields, and conducting other evasive

---

[1] A constitutional challenge to a statute can be brought either as a facial challenge, or an as-applied challenge. Defendant purports to bring both types of challenges in his motion. To succeed on a facial challenge to the constitutionality of a statute, the moving party must show that the statute is unconstitutional in all applications. *City of L.A. v. Patel*, 576 U.S. 409, 415, 418, 135 S.Ct. 2443, 192 L.Ed.2d 435 (2015). To succeed on an as-applied challenge, the moving party must show it is unconstitutional because the way it was applied to the particular facts of their case. *See United States v. Phillips*, 645 F.3d 859, 863 (7th Cir. 2011).

maneuvers. *Id.* The officer followed one of the bikers as best he could--a male driver and a female passenger.

The biker eventually entered a trailer park on Halfway Road in Williamson County. *Id.* Law enforcement then established a perimeter around the park and began an intensive search for the biker and his female passenger. *Id.*

During a foot patrol search the officers ultimately located the motorcycle parked near a tree line. As officers approached the motorcycle, they observed Defendant standing in the tree line approximately 10 feet from the motorcycle. The officers arrested Defendant. *Id.*

While searching the area around the motorcycle, officers located a black Springfield XD 9mm handgun, near where Defendant was standing. *Id.* While searching Defendant, officers discovered that he was wearing a bullet-proof vest.

Marion PD sought assistance from the FBI. Ultimately a federal search warrant was obtained for Defendant's DNA profile. FBI analysts determined that there were two male profiles present on the firearm. Analysts concluded that the likelihood that one of the dominant profiles was Defendant's was 25 quintillion to 1. *Id.* Finally, analysts concluded that there was very strong support for the inclusion of Defendant in the DNA profile. *Id.*

Defendant is a convicted felon. His most recent IDOC sentence was a 9-year term for an armed robbery. ECF 45, *Presentence Investigation Report* at 5-8. He also has a conviction for delivery of a controlled substance. *Id.* Accordingly, under 18 U.S.C. 922(g), it was unlawful for him to possess a firearm.

## III. DEFENDANT'S MOTION TO WITHDRAW
## GUITY PLEA AND DISMISS INDICTMENT

On February 1, 2024, Defendant filed a Motion to Withdraw Guilty Plea and Dismiss Indictment, based on the Memorandum and Order from another judge in this district in *United States v. Taylor*, 23-CR-40001, 2024 WL 245557 (SD IL January 22, 2024). In that Order, the court declared that § 922(g)(1) is unconstitutional, both facially and as applied. Defendant argues that the court's reasoning in *Taylor* is persuasive and that this Court should likewise declare that § 922(g)(1) is unconstitutional under the Second Amendment and *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). ECF 27. Defendant also argues that this Court should allow him to withdraw his guilty plea. This Court should deny the motions. As will be demonstrated below, § 922(g)(1) is constitutional in all respects and the court's reasoning to the contrary in *Taylor* is in error. Accordingly, it does not provide a fair and just basis for Defendant to withdraw his guilty plea.

This response will first establish the constitutionality of § 922(g)(1) in light of the *Bruen* decision and the 7th Circuit opinion in *Atkinson v. Garland*, 70 F. 4th 1018 (7th Cir. 2023), which set forth a framework for analysis of Second Amendment issues in the Seventh Circuit. Next, this response will demonstrate the flaws in the *Taylor* Memorandum and Order. Finally, the government will conclude that Defendant is not entitled to dismissal of his indictment or to withdrawal of his plea.

4

## IV. LEGAL BACKGROUND[2]

The current state of Second Amendment doctrine results from the confluence of three Supreme Court cases that the Court has decided over the last fifteen years. *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *Bruen,* 142 S. Ct. 2111 (2022).

### A. Bruen's "Text and History" Test.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. AMEND. II. Fifteen years ago, in *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment guarantees the right of "law-abiding, responsible citizens" to keep and bear arms for self-defense. 554 U.S. 570, 635 (2008). The *Heller* Court cautioned, however, that the right to keep and bear arms "is not unlimited" and remains subject to "presumptively lawful regulatory measures," including "longstanding prohibitions on the possession of firearms by felons." *Id.* at 626, 627 n.26. Two years later, the Supreme Court incorporated the rights recognized in *Heller* to state and local governments, while "repeat[ing] [the] assurances" that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality) (quoting *Heller*, 554 U.S. at 626-27).

---

[2] The government's response in this case incorporates a great portion of the analysis provided by colleagues in the Northern District of Illinois, Criminal Appeals Division, in *United States v. Gates*, no. 22-CR-00397, ECF 39 (N.D. Ill. 2023).

In *Bruen*, the Supreme Court revisited the Second Amendment once again, and held that it protects the right of "law-abiding citizens" with ordinary self-defense needs to exercise their right to keep and bear arms. 142 S. Ct. at 2156. In so doing, *Bruen* struck down a New York law requiring residents to demonstrate a "proper cause" to obtain a license to carry a handgun outside the home. *Id.* It also articulated a revised analytical framework for determining whether a modern firearm regulation is constitutional, directing courts to assess whether such regulations "are consistent with the Second Amendment's text and historical understanding." *Id.*

Under this two-step analysis, *Bruen* first directed that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129-30. Second, *Bruen* continued, where a regulation infringes on presumptively protected conduct, "[t]he government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* (cleaned up).

*Bruen* set forth two avenues of historical inquiry. The first is what *Bruen* described as a "straightforward historical inquiry," which applies when "a challenged regulation addresses a general societal problem that has persisted since the 18th century." 142 S. Ct. at 2131. Under that avenue of inquiry, to uphold a regulation as constitutional, courts should pinpoint evidence of "a distinctly similar historical regulation addressing that problem." *Id.* The second avenue of inquiry that *Bruen* directed is by "analogy." *Id.* at 2132. *Bruen* recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction

6

generation in 1868." *Id.* Where there is no such straightforward correspondence—for example, where "unprecedented societal concerns or dramatic technological changes" are implicated—*Bruen* explained that "a more nuanced approach" is required. *Id.* In these scenarios, *Bruen* directed courts to consider "historical analogies" to the challenged law to determine whether it resembles historically acceptable restrictions. *Id.*

*Bruen* further explained: "Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* (quoting C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)). And while *Bruen* did not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," it directed courts to treat as "*central* considerations," "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2132-33 (emphasis in original) (cleaned up); *see also id.* at 2133 ("*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense"). *Bruen* continued:

> To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted. On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Id.* at 2133 (emphases in original) (cleaned up).

**B. Under Bruen's Framework, the Overwhelming Majority of Federal Courts Have Upheld § 922(g)(1) as Constitutional.**

In *Bruen*, six Justices emphasized that certain firearms regulations—including prohibitions on felons' possession of firearms—remain constitutional. In his concurrence, Justice Alito explained that *Bruen* did not "disturb anything that [the Court] said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns." 142 S. Ct. at 2157 (cleaned up). Justice Kavanaugh, writing separately and joined by Chief Justice Roberts, likewise reiterated that "longstanding prohibitions on the possession of firearms by felons" remain constitutional. *Id.* at 2162 (cleaned up). *See also id.* at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) (same).

Consistent with these assertions, post-*Bruen*, nearly every federal court to have addressed the constitutionality of § 922(g)(1) has concluded that the statute remains constitutional.[3]  One court in the Southern District of Illinois is among that group. *See*

---

[3] *See, e.g., United States v. Locket*, No. 22-cr-72, 2023 WL 5153549 (S.D. Tex. Aug. 10, 2023); *United States v. Carloss*, No. 23-cr-86, 2023 WL 5152623 (E.D. Ok. Aug. 10, 2023); *United States v. Hatch*, No. 23-cr-1201, 2023 WL 5020270 (S.D. Cal. Aug. 7, 2023); *United States v. Webb*, No. 4:22-cr-75, 2023 WL 4977932 (D. Utah Aug. 3, 2023); *United States v. Andrews*, No. 18-cr-149, 2023 WL 4974766 (D. Minn. Aug. 3, 2023); *United States v. Giglio*, No. 1:23-cr-30, 2023 WL 4918332 (S.D. Miss. Aug. 1, 2023); *United States v. Bolling*, No. 2:21-cr-87, 2023 WL 4874482 (S.D.W.V. July 31, 2023); *United States v. Schnur*, No. 1:23-cr-65, 2023 WL 4881383 (S.D. Miss. July 31, 2023); *Ulmer v. United States*, Nos. 5:20-cr-131, 5:22-cv-328, 2023 WL 4865553 (E.D. N.C. July 31, 2023); *United States v. Jones*, No. 3:23-cr-31, 2023 WL 4850586 (D. Conn. July 28, 2023); *United States v. Day*, No. 5:22-cr-86, 2023 WL 4824728 (S.D. W.V. July 27, 2023); *United States v. Mosely*, No. 22-cr-620, 2023 WL 4765596 (S.D. Tex. July 26, 2023); *Black v. United States*, No. 3:23-cv-436, 2023 WL 4728839 (W.D. N.C. July 24, 2023); *United States v. Deare*, No. 6:21-cr-212, 2023 WL 4732568 (W.D. La. July 24, 2023); *United States v. Gilbert*, No. 21-cr-110, 2023 WL 4708005 (S.D. Al. July 24, 2023); *United States v. Harrison*, No. 3:22-cr-455, 2023 WL 4670957 (N.D.N.Y. July 20, 2023); *United States v. Jeffery*, No. 21-cr-437, 2023 WL 4629556 (W.D. Tex. July 19, 2023); *United States v. Faust*, No. 23-cr-2005, 2023 WL 4626672 (N.D. Iowa July 19, 2023); *United States v. Dobbs*, No. 22-cr-20068, 2023 WL 4596756 (E.D. Mi. July 18, 2023); *United States v. Morgan*, No. 8:23-cr-72, 2023 WL 4562850 (M.D. Fla. July 17, 2023); *United States v. Holmes*, No. 23-cr-20075, 2023 WL 4494340 (W.D. Mi. July 11, 2023); *Parks, Jr., v. United States*, No. 1:23-cv-80, 2023 WL 4406026 (S.D. Ga. July 7, 2023); *United States v. Ray*, No. 3:21-cr-57, 2023 WL 4378152 (S.D.W.V. July 6, 2023); *United States v. Mashburn*, No. 22-190, 2023 WL 4375615 (S.D. Al. July 6, 2023); United States v. Nicks, No. 5:23-cv-2, 2023 WL 4356065 (W.D.N.C. July 5, 2023); *United States v. Keels*, No. 23-20085, 2023 WL 4303567 (E.D. Mi. June 30, 2023); *United States v. Robinson*, No. 3:21-cr-159, 2023 WL 4304762 (N.D. Tex. June 29, 2023); *United States v. Jordan*, No. 1:23-cr-159, 2023 WL 4267602 (N.D. Ohio June 29, 2023); *United States v. Nelson*, No. 2:22-cr-20512, 2023 WL 4249367 (E.D. Mi. June 29, 2023); *United States v. Estrada*, No. 1:22-cr-256, 2023 WL 4181325

*United States v. Ware*, 22-cr-30096 at ECF 51 (S.D. Ill. May 19, 2023) (McGlynn, J.). One other court within this district has recently decided otherwise. *Taylor*, 2024 WL 24557, and that decision will be discussed elsewhere in this response. *See infra* at 44-62.

Furthermore, only three circuit courts have thus far authored opinions squarely addressing the constitutionality of Section 922(g)(1) since *Bruen*. Two held that the statute is constitutional in all of its applications, and one narrowly held that it was unconstitutional as applied to an individual with a prior felony conviction for a nonviolent offense. *Compare United States v. Jackson,* 69 F.4th 495, 501-2 (8th Cir. 2023) (explaining that "[h]istory shows that the right to keep and bear arms was subject to restrictions that included prohibitions on possession by certain groups of people," and that *Bruen* "reaffirmed" that "the right is 'subject to certain reasonable, well-defined restrictions,' "), *and Vincent v. Garland*, 80 F.4th 1197, 1202 (10th Cir. 2023) (holding that *Bruen* did not abrogate Tenth Circuit precedent upholding the constitutionality of Section 922(g)(1)), *with Range v. Attorney General,* 69 F.4th 96, 106 (3d Cir. 2023) (en banc) (holding that a conviction for food-stamp fraud could not support a ban on the defendant

(D. Id. June 26, 2023); *United States v. Barber*, No. 3:22-cr-65, 2023 WL 4157177 (D. Ak. June 23, 2023); *United States v. Hernandez*, No. 3:23-cr-56, 2023 WL 4161203 (N.D. Tex. June 23, 2023); *United States v. Hansen*, No. 4:18-cr-3140, 2023 WL 4134002 (D. Neb. June 22, 2023); *United States v. Palmore,* No. 7:23-cr-3, 2023 WL 4055698 (M.D. Ga. June 16, 2023); *United States v. Pineda*, No. 6:21-cr-482, 2023 WL 4053583 (D. Or. June 16, 2023); *United States v. Melendrez-Machado*, No. 22-cr-634, 2023 WL 4003508 (W.D. Tex. June 14, 2023); *United States v. Bulltail*, No. 22-cr-86, 2023 WL 3947823 (D. Mon. June 12, 2023); *United States v. Hampton*, No. 21-cr-766, 2023 WL 3934546 (S.D.N.Y. June 9, 2023); *United States v. Kearney*, No. 4:23- cr-29, 2023 WL 3940106 (E.D. Va. June 9, 2023); *United States v. Hal*e, No. 22-131, 2023 WL 3866865 (E.D. La. June 6, 2023); *United States v. Gallegos*, No. 1:22-cr-16, 2023 WL 3798347 (D. Id. June 2, 2023); *United States v. Hickman*, No. 3:22-cr-125, 2023 WL 3690246 (W.D. Ky. May 26, 2023); *United States v. Parker*, No. 3:22-cr-82, 2023 WL 3690247 (W.D. Ky. May 26, 2023); *Montes v. United States*, No. 5:18-cr-287, 2023 WL 3688015 (S.D. Tex. May 26, 2023); *United States v. Martinez*, No. 2:21-cr-219, 2023 WL 3687726 (D. Nev. May 22, 2023); *United States v. Villalobos*, No. 19-cr-40, 2023 WL 3044770 (D. Id. April 21, 2023).

possessing a firearm because that specific application of Section 922(g)(1) had no historical analogue).

The first federal appeals court to weigh in on the applicability of *Bruen* to section 922(g)(1) was the Eighth Circuit.  It upheld the constitutionality of § 922(g)(1) under *Bruen*'s text and history test. *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023). Addressing an as-applied challenge to § 922(g)(1)'s constitutionality brought by a defendant convicted of state-law felonies for selling controlled substances, *Jackson* explained that *Bruen* "did not disturb" the Supreme Court's prior "assurances" that *Heller* and *McDonald* did not cast doubt on felon-dispossession laws; that "there is considerable support in the historical record" for a legislature's authority "to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society" as well as those who are "deemed more dangerous than a typical law-abiding citizen"; and that history "supports the constitutionality of § 922(g)(1) as applied to Jackson and other convicted felons, because the law is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 501-06. *See also United States v. Dunn*, No. 22-2539, 2023 WL 5065149, at *3 (8th Cir. Aug. 9, 2023) ("Following [*Bruen*], this court concluded that the felon-in-possession statute is constitutional, and there is 'no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)'") (citing *Jackson*, 69 F.4th at 502).

The Ninth Circuit also has recognized a "history and tradition of regulating the possession of firearms" in deciding a challenge to the constitutionality of Sentencing Guideline § 2D1.1(b)(1), which increases a defendant's base offense level by two levels "[i]f a dangerous weapon (including a firearm) was possessed" during a drug offense. *See United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023). After reviewing relevant

historical analogues, *Alaniz* held that the Guideline was constitutional under the Second Amendment because there is "a longstanding tradition of enhancing a defendant's sentence for the increased risk of violence created by mere possession of a firearm during the commission of certain crimes" and that "drug trafficking fits squarely within that category of crimes." *Id.* at 1130. *See also United States v. Hickcox*, No. 22-50365, 2023 WL 3075054, at *1 (5th Cir. Apr. 25, 2023) (on plain-error review, rejecting *Bruen*-based challenge to § 922(g)(1)'s constitutionality "because it is not clear that *Bruen . . .* dictates such a result"); *United States v. Garza*, No. 22-51021, 2023 WL 4044442, at *1 (5th Cir. June 15, 2023) (same).[4]

Not every court has held § 922(g)(1) constitutional post-*Bruen*. In *Range v. Garland*, the Third Circuit, sitting en banc, held the statute unconstitutional as applied to an individual with a disqualifying 1995 prior conviction. 69 F.4th 96 (3d Cir. 2023). *Range* "reject[ed] the Government's contention that only 'law-abiding, responsible citizens' are counted among 'the people' protected by the Second Amendment." *Id.* at 103. It further held "the Government has not shown that our Republic has a longstanding history and

---

[4] Post-*Bruen*, federal appeals courts also have upheld other firearms regulations. In *United States v. Sitladeen*, the Eighth Circuit upheld § 922(g)(5)(A) because "unlawful aliens are not part of 'the people' to whom the protections of the Second Amendment extend." 64 F.4th 978, 987 (8th Cir. 2023). In *National Rifle Ass'n v. Bondi*, the Eleventh Circuit upheld a Florida law requiring the purchaser of a gun to be 21 years old because the "law is consistent with our Nation's historical tradition of firearm regulation," *see* 61 F.4th 1317, 1320 (11th Cir. 2023), although that court later vacated the *Bondi* panel opinion after granting a petition for rehearing en banc, *see* 2023 WL 4542153 (11th Cir. July 14, 2023). The government recognizes that the Fifth Circuit has held unconstitutional, on an as-applied basis, § 922(g)(3), which criminalizes the possession of firearms by "unlawful users" of a controlled substance. *See United States v. Daniels*, 2023 WL 5091317 (5th Cir. Aug. 9, 2023). The government further recognizes that in *United States v. Rahimi*, the Fifth Circuit also held unconstitutional § 922(g)(8)—which makes it unlawful to possess a firearm if under a court order related to domestic violence. 61 F.4th 443, 461 (5th Cir. 2023) (describing such a ban as an "outlier[] that our ancestors would never have accepted"). On June 30, 2023, the Supreme Court granted certiorari in *Rahimi*. *See* 2023 WL 4278450. And on August 16, 2023, the Fifth Circuit explained that "in fact" *Rahimi* itself "suggests that *Bruen's* logic may not extend to [§ 922(g)(1)]." *See United States v. Washington*, No. 22-10574, 2023 WL 5275013, at *1 (5th Cir. Aug. 16, 2023).

tradition of depriving *people like Range* of their firearms." *Id.* at 106 (emphasis added). *Range* emphasized that its "decision today is a narrow one," applying "only" to plaintiff Range "given his violation of" a Pennsylvania misdemeanor statute criminalizing the making of a false statement to obtain food stamps. *Id.*

### C. The Seventh Circuit's Decision in *Atkinson v. Garland.*

On June 20, 2023, the Seventh Circuit issued a 2-1 opinion in *Atkinson v. Garland*, which involved an as-applied challenge to § 922(g)(1)'s constitutionality brought in a civil matter by a plaintiff with a felony mail-fraud conviction. 70 F.4th 1018 (7th Cir. 2023). *Atkinson* left open the question of whether § 922(g)(1) remains constitutional after *Bruen*. Instead, because the district court in *Atkinson* had dismissed the complaint before *Bruen* was decided—and, as a result, without applying *Bruen's* "text and history" test—the panel majority in *Atkinson* remanded the matter "to allow the district court to undertake the *Bruen* analysis in the first instance." *Id.* at 1020. The panel majority further noted that the parties' appellate briefing also did "not grapple with *Bruen*." *Id.* at 1022.  It remanded with instructions that the government further "develop its contention that the plain text of the Second Amendment does not protect felons and other offenders impacted by § 922(g)(1)" and "conduct a more substantial historical analysis." *Id.* at 1020-24. Even more specifically, the panel majority directed the parties to consider a series of "interrelated and non-exhaustive questions" on remand (*id.* at 1023-24)—which the government addresses in this memorandum (*see infra* at Section V.C. & D.). At the same time, the panel majority recognized that "the historical analysis required by *Bruen* will be difficult and no doubt yield some measure of indeterminacy." *Id.* at 1024.

In dissent, Judge Wood explained that she would have upheld § 922(g)(1) as constitutional and without requiring a remand. *Id.* at 1018-38. Noting that "[g]un ownership and use in this country (both before and after the adoption of the 1787 Constitution) have always been subject to reasonable regulations," Judge Wood identified a "vast and diverse array of gun laws stretching from the colonial period, through the Founding Era, through Reconstruction (when the Fourteenth Amendment was added to the Constitution and ultimately made the Second Amendment applicable to state regulation), up to the present day." *Id.* at 1030, 1033. Judge Wood continued: "This is what makes up the text, history, and tradition to which *Bruen* directs us. And text, history, and tradition all point in the same direction: firearms have always been regulated in precisely the ways that concern us in the third decade of the 21st century." *Id.* at 1033. More specifically, Judge Wood explained that "the record behind the felon disentitlement statutes":

> reveals that, since the founding, governments have been understood to have the power to single out categories of persons who will face total disarmament based on the danger they pose to the political community if armed. That presumptive power is on display in the loyalty oath laws . . . and in the laws that disarmed persons found guilty of treason and members of native tribes. Though some of those laws would no longer pass muster under the Equal Protection Clause, they reveal conclusively the scope of governmental power that was understood to exist at the time the Second Amendment was adopted. This power allowed the creation of categorical restrictions without any case-by-case escape hatch. *Section 922(g)(1) does precisely what statutes have been doing since the mid-18th century. It identifies the group of persons deemed dangerous to the political community – those convicted of the defined felonies – and it makes it unlawful for them to possess a firearm.*

*Id.* at 1035-36 (emphasis added).

13

# V. ARGUMENT

Under *Bruen*'s "text and history" test, § 922(g)(1) remains a permissible restriction on firearms possession because felons do not fall within the textual purview of the Second Amendment—they are not part of "the people" referenced in the text of the Second Amendment. Furthermore, even if felons are part of "the people" referenced in the Second Amendment, § 922(g)(1) remains constitutional because the statute is consistent with this nation's historical tradition of categorically prohibiting firearm possession by untrustworthy adherents to the law and of punishing felons through, among other things, capital punishment and estate forfeiture.

## A. The Possession of Firearms by Felons Is Not Protected Under the Plain Text of the Second Amendment.

As noted above, the Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. AMEND. II. Felons do not fall within "the people" protected by the Second Amendment, and their "right . . . to keep and bear Arms" is thus not "infringed" by laws prohibiting their possession of firearms. Rather, the Second Amendment's protections extend only to "ordinary, law-abiding, adult citizens," *Bruen*, 142 S. Ct. at 2134, who are "members of the political community," *Heller*, 554 U.S. at 580. Section 922(g)(1)'s status-based restriction on who can possess firearms thus does not run contrary to the Second Amendment's plain text.

Legislatures historically have had wide latitude to exclude felons from the political community as a consequence of their convictions. In his "massively popular 1868 Treatise on Constitutional Limitations," Thomas Cooley recognized "an individual right" to keep

14

and bear arms "unconnected with militia service." *Heller*, 554 U.S. at 616 (discussing Cooley's work at length). Yet even Cooley recognized that "the people in whom is vested the sovereignty of the State . . . cannot include the whole population," and "[c]ertain classes have been almost universally excluded"—including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868). Felons therefore could historically be excluded from "exercis[ing] the elective franchise," *id.* at 29, as well as from other, closely related "political rights" belonging to "First-Class Citizens"—including the right to "hold public office," to "serve on juries," and, most relevant here, "the right to bear arms," Akhil Reed Amar, *The Bill of Rights* 48, 48 * (1998) (explaining these were all historically understood as "political rights" and that in particular, "arms bearing and suffrage were intimately linked two hundred years ago and have remained so").

It remains the case that committing a felony often results in the "forfeiture of a number of rights" tied to membership in the political community, including not just the right to bear arms but also "the right to serve on a jury and the fundamental right to vote." *See Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019) (citing 28 U.S.C. § 1865(b)(5), which bars convicted felons from serving on a federal jury; and *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974), which upheld state felon disenfranchisement); *see also Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998) (noting that consequences of a felony conviction can include deprivation of the right to hold office).

Section 922(g)(1) thus accords with the historical meaning of the Second Amendment by imposing a firearms-related disability "as a legitimate consequence of a

felony conviction." *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, J., concurring in part); *see also id.* (describing a lifetime gun-possession ban on felons as "historically grounded and sensible"). *See also, e.g., United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010) (per curiam) ("[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'"); *United States v. Carpio-Leon*, 701 F.3d 974, 979-80 (4th Cir. 2012) (observing that, historically, "felons were excluded from the right to arms because they were deemed unvirtuous") (cleaned up); *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011) ("In classical republican philosophy, the concept of a right to arms was inextricably and multifariously tied to that of the virtuous citizen, such that the right to arms does not preclude laws disarming the unvirtuous (i.e. criminals)."); *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) (same).

The Supreme Court's interpretation of the Second Amendment's text confirms the view that legislatures are permitted to disarm convicted felons. In *Heller,* the Supreme Court struck down the District of Columbia's ban on handgun possession in the home, explaining that the Second Amendment confers an individual "right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635. The Court parsed the Second Amendment's text and incorporated into its holding the recognition that the plaintiff would be entitled to keep a handgun in his home "[a]ssuming that [he] is not disqualified from the exercise of Second Amendment rights." *Id.* at 635. *See also id.* at 631 (explaining that the district court had "apparently" used the word "disqualified" to "mean if [the plaintiff] is not a felon and is not insane").

*Bruen* did not deviate from *Heller's* principle that the right to bear arms belongs only to "law-abiding, responsible citizens." 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635). Certainly, in his concurrence, Justice Alito stressed that *Bruen* "decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun." *Id.* at 2157. Still, *Bruen* characterized the holders of Second Amendment rights as "law-abiding" citizens no less than 14 times. For example, *Bruen* concluded that the New York statute "violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms," *id.* at 2156; explained that the Second Amendment "'elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense," *id.* at 2131 (quoting *Heller*, 554 U.S. at 635); and instructed courts to identify historical analogues to modern firearm regulations by assessing "how and why the regulations burden a law-abiding citizen's right to armed self-defense," *id.* at 2133.[5]

While *Bruen* invalidated New York's "may-issue" licensing regime, it approved "shall-issue" regimes that "require applicants to undergo a background check or pass a

---

[5] *See also Bruen* 142 S. Ct. at 2122 ("[T]he Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense."); *id.* ("[O]rdinary, lawabiding citizens have a similar right to carry handguns publicly for their self-defense."); *id.* at 2125 (describing petitioners as "law-abiding, adult citizens"); *id.* at 2133 (referencing New York's argument that "sensitive places where the government may lawfully disarm law-abiding citizens include all places where people typically congregate" (quotations omitted)); *id.* at 2134 (reiterating that petitioners are "two ordinary, law-abiding, adult citizens"); *id.* at 2135 n.8 ("[I]n light of the text of the Second Amendment, along with the Nation's history of firearm regulation, we conclude below that a State may not prevent law abiding citizens from publicly carrying handguns . . . ."); *id.* at 2138 ("Nor is there any such historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense."); *id.* at 2138 n.9 (noting shall-issue public carry licensing laws "do not necessarily prevent 'law abiding, responsible citizens' from exercising their Second Amendment right to public carry" but rather "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens" (quotation omitted)); *id.* at 2150 ("none [of the historical regulations surveyed] operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose"); *id.* at 2156 ("Nor, subject to a few late-in-time outliers, have American governments required law-abiding, responsible citizens to demonstrate a special need for self-protection . . . ." (quotations omitted)).

firearms safety course." *Id.* at 2138 n.9. The Court explained that shall-issue regimes—
many of which prohibit the issuance of licenses to felons—generally pass constitutional
muster because they "are designed to ensure only that those bearing arms . . . are, in fact
'law-abiding, responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635). Justice
Kavanaugh, joined by the Chief Justice, explicitly said that such "shall-issue licensing
regimes are constitutionally permissible." *Id.* at 2162 (Kavanaugh, J., concurring). *Bruen*'s
endorsement of those licensing schemes would make little sense if the Second
Amendment presumptively protected felons from disarmament.[6]

The frequency with which *Bruen* employed the phrase "law abiding, responsible
citizens"—rather than a broader reference to "the people" or "all Americans"—strongly
indicates that this was a deliberate choice of language that should be afforded due weight.
*See Jackson*, 69 F.4th at 503 (in upholding the constitutionality of § 922(g)(1), emphasizing
"the Supreme Court's repeated statements in *Bruen* that the Second Amendment protects
the right of a "law-abiding citizen" to keep and bear arms). As one court in the Northern
District of Illinois explained in rejecting a *Bruen*-based challenge to § 922(g)(1):

> Indeed, the [Bruen] majority used the phrase "law-abiding" to describe "the
> people" whose rights the Second Amendment guarantees no fewer than fourteen
> times, including in its concluding paragraph. . . .
>
> * * *
>
> The government argues that those charged under section 922(g)(1), by
> definition, are not law-abiding citizens but rather are among the classes of
> individuals whose rights to bear arms historically have been restricted for
> public safety. The Court agrees with the government. Section 922(g)(1) is a
> constitutional restriction on firearms possession because convicted
> felons—whether their underlying felony was violent or not—are, by

---

[6] A "shall-issue" regime is one in which "authorities must issue concealed-carry licenses whenever
applicants satisfy certain threshold requirements." *Bruen*, 142 S. Ct. at 2123. By contrast, a "may-issue"
regime vests "authorities [with] discretion to deny concealed-carry licenses even when the applicant
satisfies the statutory criteria." *Id.* at 2124.

definition, not law-abiding and therefore do not fall within the textual purview of the Second Amendment.

*See Edward Price*, no. 21 CR 164, ECF 122 at 4-5 (emphasis added). *Accord Ricky Price*, no. 19 CR 824, ECF. 105 at 1; *Garrett*, no. 18 CR 880, ECF 144 at 4 ("[T]he *[Bruen]* majority uses the phrase 'law-abiding' to describe 'the people' whose rights the Second Amendment guarantees no fewer than fourteen times."); *Williams*, No. 22 CR 121, ECF. 42 at 3 (May 3, 2023) ("There is room to argue that felons fall within 'the people,' but without binding precedent on that front, I accept the Supreme Court's statement that felon disarmament is presumptively lawful, and therefore outside the right protected by the Second Amendment.").[7]

Furthermore the Seventh Circuit's decision in *United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015), does not alter this analysis. In *Meza-Rodriguez*, the Seventh Circuit stated that although some of the language used in *Heller* linked Second Amendment rights with notions of "law-abiding citizens," those passages did not, themselves, define the term "people." *Id.* at 669. But as *Atkinson* itself acknowledged, *Meza-Rodriguez* was

---

[7] In the Third Circuit's en banc decision in *Range*, the majority dismissed repeated references in *Heller*, *McDonald*, and *Bruen* to "law-abiding, responsible citizens" as "dicta" because those cases did not involve "the criminal histories of the plaintiffs" and the term is "as expansive as it is vague." 69 F.4th at 101-02. *See also Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309, at *21 (expressing same concern). But as two of the dissenting judges in *Range* noted, the *Range* majority ignored critical context from *Heller* in coming to that conclusion:

> In holding "the right of the people" protected by the Second Amendment was an "individual right," Justice Scalia's seminal opinion in *Heller* specified this meant "the right of law-abiding, responsible citizens" to keep and bear arms, and therefore characterized "prohibitions on the possession of firearms by felons" as both
> "longstanding" and "presumptively lawful."

*Range*, 69 F.4th at 119 (citing *Heller*, 554 U.S. at 626-27, 635 & n.26) (Krause, J., dissenting); *see also id.* at 114 ("[T]he Supreme Court's jurisprudence tells us that the right to bear arms is limited to law abiders, and that felon bans are presumptively lawful.") (Shwartz, J., dissenting; joined by Restrepo, J.).

written before *Bruen* and therefore did not have the benefit of *Bruen's* repeated use of the phrase "law-abiding citizens" to describe the scope of the Second Amendment. *See Atkinson*, 70 F.4th at 1023 (recognizing that although the Seventh Circuit "analyzed the scope of the Second Amendment right before *Bruen*" it has "not returned to the issue since then").

In addition, an argument that the phrase "the people" must be used consistently throughout the Founding Era constitutional text proves too much and disregards the fundamentally different aspects of fundamentally different rights. For instance, noncitizens are not among "the people" who may vote in congressional elections. *See* U.S. CONST. ART. I § 2 cl. 1 ("The House of Representatives shall be composed of Members chosen every second Year by *the People* of the several States") (emphasis added)); 18 U.S.C. § 611 (excluding illegal immigrants from voting in elections for federal offices). Or as the district court noted in *Edward Price*, an argument that "the people" should be defined consistently for purposes of various amendments "ignores differences between the rights protected by the First and Second Amendments, as the exercise of rights under the First Amendment do not put at risk the physical safety of others." No. 21 CR 164, ECF 122 at 8-9.

Finally, the repeated language in *Heller* and *Bruen* limiting the scope of Second Amendment protections to "law abiding citizens" and excluding felons is no trifling matter. In the Seventh Circuit, the Supreme Court's "considered dictum" is generally binding upon the appellate court itself and on the lower courts within the Circuit. R*eich v. Continental Cas. Co.*, 33 F.3d 754, 757 (7th Cir. 1994). *See also United States v. Rice*, No. 3:22-CR-36 JD, 2023 WL 2560836, at *4 (N.D. Ind. Mar. 17, 2023); *Bembenek v. Donohoo*,

355 F. Supp. 2d 942, 950 (E.D. Wis. 2005).  Because the Supreme Court has repeatedly asserted in considered dictum that the Second Amendment does not protect the right of felons to possess firearms, this Court is not free to ignore those admonitions as mere dicta.

The Second Amendment's text—and Supreme Court cases interpreting this text consistent with history—demonstrates that it does not encompass felons in possession of firearms. Accordingly, this Court should deny Defendant's motions.

## B. Section 922(g)(1) Is Consistent With This Nation's Historical Traditions.

Even if this Court were to conclude that the test of the Second Amendment covers felons in possession of firearms, defendant still cannot prevail under *Bruen* because § 922(g)(1) "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S. Ct. at 2127. Beginning in England and lasting at least through the founding era, history is replete with regulations reflecting the power of legislatures to disarm categories of individuals. Two types of historical laws are particularly pertinent to modern-day felon-dispossession laws: (a) laws categorically disqualifying groups who were untrustworthy adherents to the law from possessing firearms; and (b) laws authorizing capital punishment and estate forfeiture for felonies. While some of these historical categorical prohibitions would be impermissible today, under other constitutional provisions, they are relevant in determining the historical understanding of the right to keep and bear arms. *Jackson*, 69 F.4th 503; *see also Range*, 69 F.4th at 122 n.50 (Krause, J., dissenting) (rejecting these "bigoted and unconstitutional laws" but citing them to demonstrate the "tradition of categorical, status-based disarmaments").

1. **Firearm Disqualification Laws**

By the time the Second Amendment was ratified in 1791, there was an established tradition of legislatures exercising broad authority to disqualify people categorically from possessing firearms based on a judgment that certain groups simply could not be trusted to adhere to the rule of law. That history is set forth next. *See Bruen*, 142 S. Ct. at 2127 (because the right to keep and bear arms was a "pre-existing right," directing courts to consider "English history dating from the late 1600s, along with American colonial views leading up to the founding").

a. **England**

Because the Second Amendment "codified a right inherited from our English ancestors," English legal tradition sheds important light on the limits to the "right secured by the Second Amendment." *Bruen*, 142 S. Ct. at 2127-28 (quoting *Heller*, 554 U.S. at 599, 626). Among the limits well-established in England was the authority to disarm classes of people who, in the legislature's view, could not be relied upon to obey the rule of law.

In 1689, for example, the English government passed a law disarming Catholics who refused to make declarations renouncing their faith. 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71-73 (1688).[8] This "Act for the better securing the Government by disarming Papists and reputed Papists" provided that a Catholic could not "have or

---

[8] Though the statutory compilation identifies this as a 1688 act, it was enacted in 1689. *See* 14 *Journals of the House of Lords* 1685-1691, at 208-09 (1767-1830) (reflecting enactment on May 11, 1689); *Bill of Rights* [1688], https://www.legislation.gov.uk/aep/WillandMarSess2/1/2 (explaining that "[i]t appears that all the Acts of" the first Parliament of William and Mary "were treated as being Acts of 1688" in official sources under an "old method of reckoning"—including the English Bill of Rights, discussed shortly, which was similarly enacted in 1689).

keepe in his House or elsewhere" any "Arms[,] Weapons[,] Gunpowder[,] or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace . . . for the defence of his House or person)." *Id.*; *see also Jackson*, 69 F.4th at 502. Enacted shortly after the Glorious Revolution of 1688—when Protestant King William and Queen Mary succeeded Catholic King James II—this statute reflected the new government's perception that Catholics who refused to renounce their faith (and thus their allegiance to the Pope) could not be trusted to obey English law. *Range*, 69 F.4th at 121-22 (Krause, J., dissenting); *see also Jackson*, 69 F.4th at 502. This prohibition was not based on a theory that all Catholics were dangerous; rather, the categorical disarmament was based on a concern with a group's propensity to disobey the sovereign. *Range*, 69 F.4th at 121-22 (Krause, J., dissenting). *See also Heller*, 554 U.S. at 592-93 ("Between the Restoration and the Glorious Revolution, the Stuart Kings Charles II and James II succeeded in using select militias loyal to them to suppress political dissidents, in part by disarming their opponents.") (Scalia, J.).[9]

In her oft-cited dissent in *Kanter v. Barr*, then-Judge Barrett also observed that the English Parliament disarmed Catholics, although her analysis focused on the "threatened violence and the risk of public injury" that Catholics (and later on, slaves and Native Americans) were presumed to present as the primary reason for disarmament. 919 F.3d

---

[9] The statute further made clear that its concern was with propensity to disobey the sovereign by providing that anyone who decided to make the declaration after having previously refused would regain the ability to keep and bear arms. 1 W. & M., Sess. 1, c. 15, *in* 6 *The Statutes of the Realm*, *supra*, at 72. Other colonial and founding-era laws discussed later in this response had similar "restoration" provisions. *See also, e.g., Range*, 69 F.4th at 123, 125-26 (Krause, J., dissenting); *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting). Section 922(g)(1) has similar provisions, allowing for the restoration of the right to keep arms upon the requisite showing. 18 U.S.C. §§ 921(a)(20) and 925(c); *see also Atkinson*, 70 F.4th at 1036 (Wood, J., dissenting) (noting that "Congress has never chosen to activate" the § 925(c) mechanism, but that her analysis of § 922(g)(1)'s constitutionality "does not depend on its existence").

437, 456–58 (7th Cir. 2019). But even Judge Barrett's dissent recognized "that [the English] Parliament disarmed Catholics because the Protestant majority found them 'untrustworthy.'" *Id.* at 457 (citing Adam Winkler, *Gunfight* 115 (2011)). Moreover, a focus on untrustworthiness—rather than, more explicitly, danger—has other historical roots. For instance, "[f]ollowing the tumult of the English Civil War, the restored Stuart monarchs disarmed nonconformist (*i.e.,* non-Anglican) Protestants," even though such nonconformists included pacifist denominations like the Quakers. *Range,* 69 F.4th at 120-21 (Krause, J., dissenting) (collecting sources). Such groups "often refused to take mandatory oaths acknowledging the King's sovereign authority over matters of religion" and, as a result, "Anglicans accused nonconformists of believing their faith exempted them from obedience to the law." *Id.* Their commitment to non-violence did not spare their firearms. *See also Jackson,* 69 F.4th at 504 ("Not all persons disarmed under historical precedents—not all Protestants or Catholics in England, not all Native Americans, not all Catholics in Maryland, not all early Americans who declined to swear an oath of loyalty—were violent or dangerous persons" and yet they were disarmed nonetheless); *Range,* 69 F.4th at 124-26 (Krause, J., dissenting) (noting that colonial- and Revolutionary-war-era laws disarmed "sizable numbers of pacifists" such as the Quakers, Moravians, and Mennonites, "not . . . because they were dangerous, but rather because their refusal to swear allegiance demonstrated that they would not submit to communal judgments in law when it conflicted with personal conviction").

The aforementioned examples from England are particularly relevant because the same Parliament wrote the 1689 English Bill of Rights, which "enshrined basic civil liberties" and became the predecessor to our Second Amendment. *Bruen,* 142 S. Ct. at

2141; *Heller*, 554 U.S. at 593; *Atkinson*, 70 F.4th at 1031 (Wood, J., dissenting). That predecessor specified that "*Protestants* may have Arms for their Defence suitable to their Conditions *and as allowed by Law*." 1 W. & M., Sess. 2, c. 2, in 6 *The Statutes of the Realm* 143 (1688) (emphases added); *see also Jackson*, 69 F.4th at 502; *Atkinson*, 70 F.4th at 1031 (Wood, J., dissenting). "Englishmen had never before claimed the right of the individual to arms." *Bruen*, 142 S. Ct. at 2142 (quotation marks and citation omitted). And yet when they first formally claimed that right, the English ensured that the Parliament retained the power — which it in fact exercised — to arm one class of the population and to disarm another based on concerns that the members of that latter class would not abide by the law. *See Atkinson*, 70 F.4th at 1031 ("Not quite a ringing endorsement of an untrammeled right to keep and bear arms, it instead builds in the idea that this right exists 'as allowed by law.'") (Wood, J., dissenting).

### b. Colonial America

The American colonies inherited the English tradition of broad legislative authority to disarm classes of people who were not dependable adherents to the rule of law. For example, firearm regulations directed toward disarming Native Americans and Black people were pervasive.[10] "While some of these categorical prohibitions of course

---

[10] *See* Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 28-29 (2006); *see also, e.g., Laws and Ordinances of New Netherland, 1638-1674*, at 18-19 (1868) (1639 New Netherland law); 1 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 255-56 (1823) (1643 Va. law); 5 *Records Of The Colony Of New Plymouth* 173 (1856) (1675 Plymouth law); 2 *Records of the Colony of Rhode Island and Providence Plantations* 561 (1857) (1677 R.I. law); 2 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 481-82 (1823) (1680 Va. law); *Grants, Concessions, and Original Constitutions of the Province of New Jersey: The Acts Passed During the Proprietary Governments, and Other Material Transactions Before the Surrender Thereof to Queen Anne* 341 (1753) (1694 N.J. law); 2 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 235 (1896) (1706 Pa. law); 1 *The Laws of Maryland, With The Charter, The Bill of Rights, The Constitution of The State, and Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments* 117-18 (1811) (1715 Md. Law); 6 *The Public Records Of The Colony Of Connecticut* 381-82 (1872) (1723 Conn. law); *Laws of New York From The Year 1691 to 1773*, at 199 (1752) (1730

would be impermissible today under other constitutional provisions, they are relevant here in determining the historical understanding of the right to keep and bear arms." *Jackson*, 69 F.4th 503; *see also Range*, 69 F.4th at 122 n.50 (Krause, J., dissenting) (rejecting these "bigoted and unconstitutional laws" but citing them to demonstrate the "tradition of categorical, status-based disarmaments"). The colonies also disarmed full-fledged members of the political community—i.e., free, Christian, white men— "whom the authorities believed could not be trusted to obey the law." *Range*, 69 F.4th at 122 (Krause, J., dissenting). "Those restrictions are telling because they were imposed at a time when, before the advent of the English Bill of Rights, the charters of Virginia and Massachusetts provided unprecedented protections for colonists' firearm rights." *Id.* (citing Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 174 (3d ed. 2022)).

Massachusetts, for example, disarmed the supporters of an outspoken preacher in the 1630s "not because those supporters had demonstrated a propensity for violence," but because "the authorities concluded their conduct evinced a willingness to disobey the law." *Range*, 69 F.4th at 123 (Krause, J., dissenting) (citing Edmund S. Morgan, *The Case Against Anne Hutchinson*, 10 New Eng. Q. 635, 637-38, 644, 648 (1937)); Ann Fairfax Withington & Jack Schwartz, *The Political Trial of Anne Hutchinson*, 51 New Eng. Q. 226, 226 (1978); James F. Cooper, Jr., *Anne Hutchinson and the "Lay Rebellion" Against the Clergy*,

---

N.Y. Law); *A Complete Revisal of All the Acts of Assembly, of the Province of North-Carolina, Now in Force and Use* 152-54 (1773) (1753 N.C. law); 6 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 319-20 (1899) (1763 Pa. law); *Digest of the Laws of the State of Georgia From Its First Establishment as a British Province Down to the Year 1798, Inclusive, and the Principal Acts of 1799*, at 153-55 (1800) (1768 Ga. Law); *see also Atkinson*, 70 F.4th at 1035 n.2 (Wood, J., dissenting) (citing "laws that disarmed persons found guilty of treason and members of native tribes").

61 New Eng. Q. 381, 391 (1988); John Felipe Acevedo, *Dignity Takings in the Criminal Law of Seventeenth-Century England and the Massachusetts Bay Colony*, 92 Chi.-Kent L. Rev. 743, 761 (2017)).

### c. Revolutionary War

Throughout the Revolutionary War, American legislatures passed numerous disarmament laws targeting those who failed to demonstrate loyalty to the emerging American government.

An early example is a 1775 Connecticut law providing that any person convicted of "libel[ing] or defam[ing]" any acts or resolves of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights and privileges" of the colonies "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 193 (1890) (1775 Conn. law). In 1776, the Continental Congress recommended that colonial governments disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments in the war effort. 4 *Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776). At least six of the colonies enacted legislation in this vein. *See* 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479-84 (1886) (1776 Mass. law); 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (1862) (1776 R.I. law); 1 *The Public Acts of the General Assembly of North Carolina* 231 (1804) (1777 N.C. law); *Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776*, at 90 (1777) (1777 N.J. law); 9 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 112-13 (1903) (1777 Pa. law); 9 *The Statutes at Large; Being A Collection*

*of All the Laws of Virginia* 282 (1821) (1777 Va. law); *see also Jackson*, 69 F.4th at 503 ("In the era of the Revolutionary War, the Continental Congress, Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey prohibited possession of firearms by people who refused to declare an oath of loyalty."); *Atkinson*, 70 F.4th at 1034 (Wood, J., dissenting) ("During the American Revolution, several states passed laws providing for the confiscation of weapons owned by persons who refused to swear an oath of allegiance to the state or to the United States.").

A common feature of these laws was to require oaths of loyalty to the government and to strip anyone who failed or refused to take the oath of the right to bear arms. *See, e.g.*, 1776 Mass. law at 479-80; 1776 R.I. law at 566-67; 1777 N.C. law at 229-31; 1777 Pa. law; at 111-13; 1777 Va. law at 281-82. Many of these laws provided that failing or refusing to take the oath resulted in forfeiture of a bundle of additional political rights, including the rights to vote, to serve on juries, and to hold public office—further reinforcing the longstanding connection between arms-bearing and these related rights, *see supra* at Section IV.A. *See, e.g.*, 1776 Mass. law at 481; 1777 N.C. law at 231; 1777 Pa. law at 112-13; 1777 Va. law at 282.

As noted earlier, the Pennsylvania law had the effect of depriving "sizable numbers of pacifists" of the right to bear arms "because oath-taking violated the religious convictions of Quakers, Mennonites, Moravians, and other groups." *Range*, 69 F.4th at 125 (Krause, J., dissenting). That law is also particularly informative because the year before enacting it, Pennsylvania became one of the first states to adopt a state constitutional provision protecting an individual right to bear arms. *Heller*, 554 U.S. at 601; *see* Pa. Declaration of Rights of 1776 § XIII, *in The Complete Bill of Rights: The Drafts,*

*Debates, Sources, and Origins* 278 (Neil Cogan ed., Oxford University Press 2d ed., 2014); *see also* N.C. Declaration of Rights of 1776 § XVII, *in The Complete Bill of Rights, supra*, at 277-78 (individual rights-based constitutional provision adopted the year before the North Carolina disarmament law cited above); Mass. Const. of 1780, pt. I, art. XVII, *in The Complete Bill of Rights, supra*, at 277 (individual rights-based constitutional provision adopted four years after the Massachusetts disarmament law cited above).

### d. Ratification Debates

The history behind the Second Amendment's adoption provides additional persuasive evidence that the founders understood the individual right to bear arms to be compatible with broad legislative authority to disarm groups who could not be trusted to follow the law.

One "Second Amendment precursor" that *Heller* described as "highly influential" is particularly instructive. 554 U.S. at 604. When the Pennsylvania ratifying convention met in 1787, one of the "main issues throughout the . . . debate" was the Antifederalists' objection to the Constitution's "lack of a Bill of Rights." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 627 (1971). Although the Antifederalists did not persuade a majority of the convention to reject ratification on this basis, their principal objections were ultimately vindicated four years later through the adoption of the Bill of Rights, eight provisions of which—including the Second Amendment—echoed a set of amendments first proposed by the Pennsylvania Antifederalists. *Id.* at 628 (explaining that these specific proposals are "of great importance in the history of the federal Bill of Rights").

29

The Pennsylvania Antifederalists' proposed constitutional amendment regarding the right to bear arms stated: "no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals." *Id.* at 665 (emphasis added). In other words, the founders recognized that "crimes committed"—violent or not—can supply an independent ground for a legislature to prohibit firearm possession. As the D.C. Circuit has explained, "[t]he use of the word 'or'" in this proposal reflects that "criminals, in addition to those who posed a 'real danger,'" have historically been "proper subjects of disarmament." *Medina*, 913 F.3d at 158-59. The Pennsylvania Antifederalists were not alone in proposing a Second Amendment precursor that expressly permitted laws disarming untrustworthy people. At the Massachusetts convention, founding Father Samuel Adams proposed an amendment providing that the "Constitution be never construed to authorize Congress . . . to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." 2 Schwartz, *supra*, at 675, 681 (emphasis added) (quotation marks omitted). And in New Hampshire, the convention recommended an amendment providing that "Congress shall never disarm any Citizen unless such as are or have been in *Actual Rebellion*." *Id.* at 758, 761 (emphasis added). These proposals, like the Pennsylvania one, recognize the prevailing historical tradition of broad legislative power to disarm people who fell outside the trustworthy, law-abiding citizenry.

To be sure, the Second Amendment, as adopted, does not include the same language as these proposals. But it would have been "obvious" to the founders that certain groups, including "the felon," Cooley, *supra*, at Section IV.A, could properly be subject to disarmament laws consistent with the "*pre-existing* right" that was "codified"

in the Second Amendment, *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 592). *See also* Amar, *supra*, at 48; Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008) (founding-era proponents of a constitutional right to bear arms "did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" during the debates over "what became the Second Amendment," because this limitation "was understood").

Under *Bruen*, the absence of any meaningful founding-era "disputes regarding the lawfulness" of potential regulations disarming criminals permits courts to "assume it settled" that such regulations are "consistent with the Second Amendment." 142 S. Ct. at 2133. *Bruen* itself illustrated that "[a]lthough the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited— *e.g.*, legislative assemblies, polling places, and courthouses"—where the Court was "also aware of no disputes regarding the lawfulness of such prohibitions," it could "assume it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id.* The same conclusion can be drawn with respect to felon disarmament.

### e. Felony Punishment Laws

For centuries, felonies have been "the most serious category of crime." *Medina*, 913 F.3d at 158. In 1769, English jurist Blackstone defined a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, *Commentaries on the Laws of England* 95 (1769). Blackstone observed

31

that "[t]he idea of felony is indeed so generally connected with that of capital punishment, that we find it hard to separate them." *Id.* at 98.

Capital punishment and forfeiture of estate were also commonly authorized punishments in the American colonies (and then the states) up to the time of the founding. *See Medina*, 913 F.3d at 158. Capital punishment for felonies was "ubiquit[ous]" in the late 18th century and was "'the standard penalty for all serious crimes.'" *See Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., joined by Scalia, J., concurring in the judgment) (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002)). Indeed, the First Congress (which drafted and proposed the Second Amendment) made a variety of felonies punishable by death, including not only offenses like treason, murder on federal land, and piracy on the high seas, but also nonviolent conduct relating to forging or counterfeiting a public security. *See An Act for the Punishment of Certain Crimes Against the United States*, 1 Stat. 112-15 (1790). States in the early Republic likewise treated "nonviolent crimes such as forgery and horse theft" as "capital offenses." *Medina*, 913 F.3d at 159; *see* Banner, *supra*, at 18 (referring to specific examples of individuals in Georgia who "escaped from jail after being condemned to death" for "forgery" or "horse-stealing"). And many American jurisdictions up through the end of the 1700s authorized complete forfeiture of a felon's estate. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn.275-276 (2014) (citing statutes).

Throughout the 1700s, American colonies punished a variety of crimes with death, estate forfeiture, or both. A 1700 Pennsylvania law provided that any person convicted of "wilfully firing any man's house, warehouse, outhouse, barn or stable, shall forfeit his or her whole estate to the party suffering, and be imprisoned all their lives in the House

32

of Correction at hard labor." 2 *Statutes at Large of Pennsylvania from 1682 to 1801*, at 12 (1896). A 1705 Pennsylvania law provided that a person convicted of rape "shall forfeit all his estate" if unmarried, and "one-third part thereof" if married, in addition to receiving 31 lashes and imprisonment for "seven years at hard labor." *Id.* at 178. A 1715 Maryland law provided that anyone convicted of "corruptly embezzling, impairing, razing, or altering any will or record" that resulted in injury to another's estate or inheritance "shall forfeit all his goods and chattels, lands and tenements." 1 *The Laws of Maryland, With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments* 79 (1811). A 1743 Rhode Island law provided that any person convicted of forging or counterfeiting bills of credit "be adjudged guilty of Felony" and "suffer the Pains of Death" and that any person knowingly passing a counterfeit bill be imprisoned, pay double damages, and "forfeit the remaining Part of his Estate (if any he hath) both real and personal, to and for the Use of the Colony." *Acts and Laws of The English Colony of Rhode Island and Providence-Plantations in New-England in America* 33-34 (1767). And a 1750 Massachusetts law provided that rioters who refused to disperse "shall forfeit all their lands and tenements, goods and chattles [sic]," in addition to receiving 39 lashes and one year's imprisonment. 3 *Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 545 (1878).

Similarly, in 1777, Virginia adopted a law for the punishment of forgery, which the legislature believed previously "ha[d] not a punishment sufficiently exemplary annexed thereto." 9 *The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature* 302 (1821) (1777 Va. forgery law). The act stated that

33

anyone convicted of forging, counterfeiting, or presenting for payment a wide range of forged documents "shall be deemed and holden guilty of felony, shall forfeit his whole estate, real and personal, shall receive on his bare back, at the publick whipping post, thirty nine lashes." *Id.* at 302-03. *See also, e.g., A Digest of the Laws of Maryland* 255-56 (1799) (collecting Maryland forgery laws enacted between 1776 and 1778, each of which provided that those convicted "shall suffer death as a felon, without benefit of clergy").

In 1788, just three years before the Second Amendment's ratification, New York passed a law providing for the death penalty for crimes including counterfeiting (as well as burglary, robbery, arson, and malicious maiming and wounding). 2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)*, at 664-65 (1886) (1788 N.Y. law). The act also established that every person convicted of such an offense "shall forfeit to the people of this State, all his[] or her goods and chattels, and also all such lands, tenements, and hereditaments[] . . . at the time of any such offence committed, or at any time after." *Id.* at 666. For other felonies, the authorized punishment for "the first offence" was a "fine, imprisonment, or corporal punishment," and the punishment "for any second offense . . . committed after such first conviction" was "death." *Id.* at 665.[11]

As the D.C. Circuit has observed, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158; *see also Jackson*, 69 F.4th at 503 (noting that early legislatures "authorized punishments that subsumed disarmament—

---

[11] Two years earlier, New York had passed a law severely punishing counterfeiting of bills of credit. 2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)*, at 260-61 (1886) (1786 N.Y. law). The law said a counterfeiter "shall be guilty of felony, and being thereof convicted, shall forfeit all his or her estate both real and personal to the people of this State . . . ." *Id.* at 261.

death or forfeiture of a perpetrator's entire estate—for non-violent offenses involving deceit and wrongful taking of property"); *Range*, 69 F.4th at 126-27 (Krause, J., dissenting) ("[T]he ubiquity of the death penalty suggests that the Founding generation would have had no objection to imposing on felons the comparatively lenient penalty of disarmament."). Thus, "tradition and history" show that "those convicted of felonies are not among those entitled to possess arms" under the Second Amendment. *Medina*, 913 F.3d at 158, 160.

In her dissent in *Kanter*, then-Judge Barrett resisted this analysis, concluding that "[t]he upshot of this history for present purposes is that the consequences of a felony conviction were not as categorically severe as the government suggests." 919 F.3d at 461 (Barrett, J., dissenting). At the same time, the *Kanter* dissent recognized, "history does show that felons could be disqualified from exercising certain rights—like the rights to vote and serve on juries—because these rights belonged only to virtuous citizens." *Id.* at 462 (citing Cooley, *supra*). In other words, even a contrary point of view recognizes a form of "civil death" that resulted from the commission of a felony. *Id.* at 458. Although the *Kanter* dissent tries to divorce this "civil death" from disarmament—arguing that the former implicates rights exercised "as part of the collective enterprise of self-governance," while the right to bear arms is a purely individual one—the majority in *Kanter* did not agree with that view of history. *Id.* at 462 (acknowledging that "the majority is sympathetic to [the] view" that the same lack of virtuosity or "poor character" that cost felons their civic rights also permitted legislatures to disarm them).

Moreover, the *Kanter* dissent does not reckon with language in Supreme Court decisions linking the Second Amendment's protections to the ability to exercise civic

rights. As noted earlier, Supreme Court jurisprudence ties the Second Amendment's protections to "ordinary, law-abiding, adult citizens," *Bruen*, 142 S. Ct. at 2134, who are "members of the political community," *Heller*, 554 U.S. at 580. Even the consequence of mere "civil death," in other words, is enough to demonstrate that the Second Amendment does not protect felons' possession of firearms.

### C. Summary of the *Atkinson* Factors

To help summarize the analysis set forth in Section IV.B above, the government relies on the questions expressly posed by the *Atkinson* panel majority. 70 F.4th at 1023-24. In response to those questions, the government states:

*First*, § 922(g)(1) addresses a "general societal problem that has persisted since the 18th century" in that the statute relates to the disarmament of individuals who, like felons, are untrustworthy adherents to the rule of law. The historical record discussed above demonstrates that the founders inherited a tradition under which legislatures had broad discretion to disarm classes of people that could not be counted upon to be responsible, law-abiding members of the polity. Like the laws enacted by earlier generations, § 922(g)(1) permits legislatures to categorically disarm groups of people who present that concern.

*Second*, history tells us that: (1) across relevant eras, legislatures categorically disarmed groups who they feared would disregard the law and disturb the social order and that such a categorical prohibition specifically appeared in the English precursor to the Second Amendment; (2) the Ratification Debates reflect no meaningful founding-era disputes regarding the lawfulness of disarming criminals, despite the use of express language to that effect in influential American precursors to the Second Amendment,

thus demonstrating that the founders understood the right to bear arms to be compatible with the broad legislative authority to disarm felons; and (3) under English common law and throughout early American history, convicted felons were subject to capital punishment, estate forfeiture, and so-called "civil death," thus demonstrating that firearms dispossession was subsumed within those greater punishments and the expulsion of felons from the political community.

From these lessons, this Court can conclude that § 922(g)(1) does not violate the Second Amendment. The aforementioned regulations were pervasive, and their underlying rationales—like the impetus behind § 922(g)(1)—prioritized social order and respect for the law over a pre-existing right to self-defense. *See Bruen*, 142 S. Ct. at 2132-33 (directing courts to consider as "*central* considerations when engaging in an analogical inquiry," "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified"); *Jackson*, 69 F.4th at 504-05 (explaining that § 922(g)(1) aims to disarm individuals viewed as "potentially irresponsible" and to prevent not just violence, but also "lawlessness"). Although some of these predecessors do not apply specifically to felons, this Court should remain mindful of *Bruen*'s admonition that "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*" and "[s]o even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." 142 S. Ct. at 2133. Moreover, the lack of an identical historical statute does not suggest that the founding generation would have viewed § 922(g)(1) as violating the Second Amendment. As one district court has observed, a "list of the laws that *happened to exist*

in the founding era is . . . not the same thing as an exhaustive account of what laws would have been theoretically *believed to be permissible* by an individual sharing the original public understanding of the Constitution." *United States v. Kelly*, No. 3:22-CR-37, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022). Founding-era legislatures cannot be presumed to have legislated to the full limits of their constitutional authority.

*Third*, although the government has emphasized the historical rationale for disarming groups perceived as an overall threat to the social order, a historical rationale for disarmament based on perceived danger supplies another helpful analogue. In *Jackson*, the Eighth Circuit reviewed a substantially similar set of historical materials as the materials summarized above and concluded that they could be read as supporting either rationale. 69 F.4th at 502 ("While the better interpretation of the history may be debatable, we conclude that either reading supports the constitutionality of § 922(g)(1) as applied to Jackson and other convicted felons."). *See also id.* at 502-05 (evaluating historical materials through a dangerousness lens). A dangerousness-rooted historical rationale for disarmament supports the validity of § 922(g)(1), as applied to all felons. As *Jackson* explained, "[l]egislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable *risk of danger* if armed," not based on "an individualized determination of dangerousness as to each person in a class of prohibited persons." *Id.* at 504 (emphasis added). *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) (historical evidence supports the proposition "that the legislature may disarm those who have demonstrated *a proclivity for violence or whose possession of guns would otherwise threaten the public safety*") (emphasis added). And as the Seventh Circuit's *Kanter* majority has explained, "prohibiting even nonviolent felons . . .

from possessing firearms is substantially related to [the government's] interest in preventing gun violence" where an empirical connection exists "between nonviolent offenders . . . and a risk of future violent crime." 919 F.3d at 448-49. The Seventh Circuit said the same in *Yancey*, explaining that "most felons are nonviolent, but someone with a felony conviction on his record is more likely than a non-felon to engage in illegal and violent gun use." 621 F.3d at 685. *See also Kaemmerling v. Lappin*, 553 F.3d 669, 683 (D.C. Cir. 2008) ("[N]onviolent offenders not only have a higher recidivism rate than the general population, but certain groups—such as property offenders—have an even higher recidivism rate than violent offenders, and a large percentage of the crimes nonviolent recidivists later commit are violent.").

*Fourth*, the aforementioned analogous laws supply enough of a historical tradition to support the constitutionality of § 922(g)(1). These are not "isolated instances of regulation," *Atkinson*, 70 F.4th at 1024, but are rather rooted in English common law and were adopted across the colonies before their understanding and the practice they represented was incorporated into the Second Amendment.

The government addresses the fifth and final question posed by *Atkinson* in the section that follows regarding the as-applied nature of defendant's challenge.

### D. Construed as an As-Applied Challenge, Defendant's Motion Still Fails.

In his Motion to Withdraw Plea and Dismiss Indictment, Defendant simply asserts, in a conclusory fashion, that § 922(g)(1) is "unconstitutional both facially and as applied." ECF 53, *Motion to Withdraw Plea and Dismiss Indictment* at 1 and 5. Defendant does not attempt to explain why a felon with his particular convictions and background is aggrieved by § 922(g)(1).

**1. Defendant Has Waived his As-Applied Challenge to the Constitutionality of § 922(g)(1).**

Defendant's failure to assess his prior felony convictions and his background ignores the fundamental question that *Atkinson* mandates must be addressed in as-applied claims:

> If history supports Atkinson's call for individualized assessments or for a distinction between violent and non-violent felonies, how do we define a non-violent or a non-dangerous felony? And what evidence can a court consider in assessing whether a particular felony conviction was violent? For instance, can a court consider the felony conviction itself, the facts of the underlying crime, or sentencing enhancements? *Bruen* shows that these distinctions should also have firm historical support. See 142 S. Ct. at 2132–33 (explaining that the court must assess whether modern and historical regulations are "relevantly similar," including in terms of how and why the regulations burden gun rights).

*Atkinson*, 70 F.4th at 24.

A defendant who raises an undeveloped argument in a perfunctory, one-sentence assertion has waived it. *See United States v. Hassebrock,* 663 F.3d 906, 914 (7th Cir. 2011) (finding the argument was "decidedly underdeveloped and therefore waived"); *United States v. Foster,* 652 F.3d 776, 792 (7th Cir. 2011) ("As we have said numerous times, undeveloped arguments are deemed waived [.]") (internal quotation marks and citation omitted). *See also Willis v. Lepine,* 687 F.3d 826, 836 (7th Cir. 2012) ("Merely reciting the Rule 59(a) standard and then tossing the motion into the court's lap is not enough. Failure to adequately present an issue to the district court waives the issue on appeal."); *United States v. Berkowitz,* 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by

pertinent authority, are waived...”). Accordingly, this Court should reject Defendant's as-applied challenge to § 922(g)(1) as waived.

### 2. Even if Defendant had Preserved his As-Applied Argument, it Would Still Fail

The Seventh Circuit has never actually upheld an “as applied” Second Amendment challenge to § 922(g) and has, in fact, “repeatedly rejected as-applied Second Amendment challenges” to that statute. *See Kanter*, 919 F.3d at 443. Certainly, the Seventh Circuit in *Kanter* noted that it “left room for as-applied challenges” to § 922(g). 919 F.3d at 443. But, to date, the Seventh Circuit has not sustained one. Regardless, there is no question here that defendant is a convicted felon—that is, a non-law-abiding citizen not covered by the Second Amendment and subject to firearms regulations consistent with this nation's historical tradition.

Furthermore, there is no historical evidence to support a position that the constitutionality of § 922(g)(1) turns on individualized assessments. This is a flaw that the *Atkinson* panel majority also noted:

> [A]lthough Atkinson has shown some support for the idea that a group's “dangerousness” is what mattered to the Founders, he does not provide much historical basis for individualized assessments or for delineating between individuals who committed violent versus non-violent crimes. The distinction is not an obvious consequence of many of the laws that Atkinson, and his amicus especially, discuss.

70 F.4th at 1023; *see also id.* (“Atkinson's historical analysis falls short.”). Instead, as detailed above, the historical tradition supports the legislature's ability to disarm *categories* of individuals. *See Atkinson*, 70 F.4th at 1035 (Wood, J., dissenting) (“since the founding, governments have been understood to have the power to single out categories of persons who will face total disarmament”); *Jackson*, 69 F.4th at 504 (“Legislatures

41

historically prohibited possession by categories of persons . . . ."); *Kanter*, 919 F.3d at 464 (Barrett, J., dissenting) (disarmament "is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons"); *United States v. Booker*, 644 F.3d 12, 23 (1st Cir. 2011) (pre-*Bruen*, explaining that "the Second Amendment permits categorical regulation of gun possession by classes of persons . . . rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis"). The relevant question, in other words, is whether the status at issue indicates that the person cannot be trusted to use a gun responsibly, not whether each individual can be trusted to do so.[12]

In addition, there is no historical evidence to support a position that the historical tradition supports disarming only individuals more dangerous than Defendant. *See Atkinson*, 70 F.4th at 1024 ("Nor does Atkinson tell us what the Founders would have viewed as a 'violent' crime and what evidence they would consider in making that determination."). In fact, as set forth above, the historical tradition reflects a far broader conception of "dangerous," one that includes even the risk of violence. *See, e.g., Atkinson*, 70 F.4th at 1035 (Wood, J., dissenting) (disarmament was "based on the danger [categories

---

[12] Individualized assessments could also yield wildly disparate results. *See, e.g., Atkinson*, 70 F.4th at 1027 (Wood, J., dissenting) (suggesting that enabling individuals to seek to establish a case-specific exemption from a generally applicable criminal law would create "an arbitrary patchwork of decisions—as far from the rule of law as one could image"); *United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011) (individualized exemptions would "obviously present serious problems of administration, consistency and fair warning"). And in the criminal context, in particular, the opportunity for pre-trial fact-finding is limited by Federal Rule of Criminal Procedure 12, which makes such as-applied challenges difficult to administer and resolve before trial if individualized facts, at least those relevant to the crime itself (like a § 922(g)(3) offense), are relevant. *See, e.g., United States v. Pope*, 613 F.3d 1255 (10th Cir. 2010) (Gorsuch, J.) (concluding that as-applied Second Amendment challenge to § 922(g)(9) could not be brought pre-trial because the defendant "contends the statute is unconstitutional only in light of the 'facts surrounding the commission of the alleged offense'—the very facts a court may not consider before trial" (citation omitted)); Fed. R. Crim. P. 12(b)(3) (limiting pretrial motions to motions that "can be determined without a trial on the merits").

of persons] pose[d] to the political community if armed"); *Jackson*, 69 F.4th at 504 (disarmament "based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed"); *Alaniz*, 69 F.4th at 1129-30 (there is "a longstanding tradition of enhancing a defendant's sentence for the increased risk of violence created by mere possession of a firearm during the commission of certain crimes"); *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting) ("Breaches of the peace comprise not only cases of actual violence to the person of another, but any unlawful acts, tending to produce an actual breach of the peace; whether the peace of the public, or an individual, be in fact disturbed or not.") (citing *Pearce v. Atwood*, 13 Mass. 324, 332 (1816)).

Defendant has a criminal history that includes delivery of controlled substances and armed robbery offenses.   ECF 45, *Presentence Investigation* Report. This criminal record more than supports a finding of dangerousness (even assuming that label is relevant to the § 922(g)(1) constitutionality analysis) as it reflects the risk Defendant poses to public safety, his disregard for the law, and society's inability to trust that he will use a weapon responsibly. *See United States v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011) (characterizing drug crimes as being "associated with dangerous and violent behavior" and thus "warrant[ing] a higher degree of precaution"); *see also Edward Price*, No. 21 CR 164, ECF 122 at 5, n.2 (in rejecting constitutional challenge to § 922(g)(1), relying on *Bullock* to explain why a defendant's prior narcotics-related convictions "are indicative of dangerous activity"). There is no question therefore that defendant is among the class of individuals constitutionally prohibited from possessing firearms under § 922(g)(1) and, therefore, any as applied challenge would fail, even if appropriately preserved.

### E. This Court Should Deny Defendant's Motion to Withdraw Guilty Plea

Defendant also requests that this Court allow him to withdraw his guilty plea. The Court should deny this motion.

It is axiomatic that a defendant does not have an absolute right to withdraw their guilty plea. *See United States v. Pike*, 211 F.3d 385, 388 (7th Cir. 2000); *United States v. Schilling*, 142 F.3d 388, 398 (7th Cir.1998). Prior to sentencing, a judge may permit an individual to withdraw his plea, only if he "can show a fair and just reason for requesting the withdrawal." Fed.R.Crim.P. 11(d)(2)(B), *United States v. Mays*, 593 F.3d 603, 607 (7th Cir. 2010); *United States v. Abdul*, 75 F.3d 327, 329 (7th Cir.1996), The burden of justifying relief always rests with the defendant. *See United States v. Coonce*, 961 F.2d 1268, 1275 (7th Cir.1992). "When a proper Rule 11 colloquy has taken place, a guilty plea enjoys a presumption of verity and the 'fair and just' Rule 11(d)(2)(B) escape hatch is narrow." *Mays*, 593 F.2d at 607; *United States v. Roque-Espinoza*, 338 F.3d 724, 726 (7th Cir.2003). A defendant's burden of showing the existence of a fair and just reason is heavy in such circumstances. *Mays*, 593 F.3d at 607; *United States v. Chavers*, 515 F.3d 722, 724 (7th Cir.2008).

The Seventh Circuit has recognized several fair and just reasons for withdrawing a plea, including: the plea was not made voluntarily and knowingly, *United States v. Weathington*, 507 F.3d 1068, 1073 (7th Cir.2007); actual innocence, *United States v. Carroll*, 412 F.3d 787, 792 (7th Cir.2005); and legal innocence, *United States v. Rinaldi*, 461 F.3d 922, 927 (7th Cir.2006).

Defendant apparently is arguing that he is entitled to withdraw his guilty plea because the court's decision in *Taylor* signals that he is legally innocent because the statute under which he is charged is unconstitutional. There is some authority for the

44

proposition that a post-guilty plea, pre-sentence change in Supreme Court precedent that bears on a defendant's legal innocence may constitute a fair and just reason for permitting the withdrawal of the plea. *Mays,* 593 F.3d at 607, *citing United States v. Ortega-Ascanio,* 376 F.3d 879 (9th Cir.2004); *United States v. Presley,* 478 F.2d 163, 167-68 (5th Cir.1973). Here, however, there was no intervening change in Supreme Court precedent that allows Defendant to claim legal innocence.  There is simply a decision from a sister-court in this District that was wrongly decided, that conflicts with another district court in the Southern District of Illinois, and that is contrary to the great weight of other authority around the nation's Federal courts. Furthermore, Defendant's Motion to Withdraw his guilty plea is both waived and untimely.

### 1. Defendant's Motion to Withdraw His Guilty Plea is Waived and Untimely

Defendant pled guilty in this case on July 13, 2023. ECF 37. He entered his plea over a year after the Supreme Court decided  *Bruen.* Furthermore, he also entered his plea three weeks after the Seventh Circuit decided *Atkinson.*  While it might have been possible for Defendant to argue that had he pled guilty prior to *Atkinson,* then he would have had a fair and just reason to withdraw his plea. His post-*Atkinson* plea does not, however, offer that same possibility.

Before *Atkinson* (and before *Bruen),* the Seventh Circuit applied a two-step means-end framework (and ultimately, intermediate scrutiny) and held that § 922(g)(1) was constitutional. *Kanter*, 919 F.3d at 439, 451.  *Atkinson* reconsidered this precedent in light of *Bruen*. In other words, before *Atkinson*, the controlling, settled law in the Seventh Circuit was that § 922(g)(1) is constitutional. *Atkinson* later held that this precedent must be reconsidered given *Bruen*. Such a change in law can constitute  a "fair and just reason"

for Defendant withdrawing his plea. Fed. R. Crim. P. 11(d)(2) (B). In this case, however, Defendant entered his plea ***after*** *Atkinson,* and he can point to no change in any law binding on this Court that constitutes a fair and just reason for him to withdraw his plea. *See United States v. Reed*, 859 F.3d 468,471 (7th Cir. 2017) ("Whether to allow withdrawal is left to the sound discretion of the district court[.]") (cleaned up).

### F. The District Court's Decision in Taylor

Defendant apparently seeks to circumvent the fact that his guilty plea was entered post-*Atkinson* by citing to the court's recent Memorandum and Order in *United States v. Taylor*, No. 23-CR-40001-SMY, 2024 WL 245557 (S.D. Ill. Jan. 22, 2024). In *Taylor,* the District Court held that § 922(g)(1) is unconstitutional, both facially and as-applied. This Court should reject this argument. The court's conclusions in *Taylor* were in error and thus cannot form the basis for Defendant's Motion to Withdraw Guilty Plea and Dismiss his Indictment.

As an initial matter, a decision of a sister-court within this District does not represent a change in controlling law sufficient to give rise to a justifiable reason for a defendant to withdraw his guilty plea. While this Court could adopt the same reasoning as *Taylor*, the mere fact that a sister-court decided an issue a certain way is obviously not binding on this Court. This Court should decline to adopt the reasoning in *Taylor.*

### 1. The Court in *Taylor* Failed to Analyze and Distinguish Facial versus As-Applied Challenges to Statutes.

In its ruling granting Taylor's Motion to Dismiss, the district court declared § 922(g)(1) unconstitutional, "facially and as applied." *Id.* at *5. In doing so, the district court failed to conduct an as-applied analysis and essentially decided the case before it

46

on a basis that can only be sustained if no set of circumstances exists under which § 922(g)(1) would be valid. *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100, 95 L. Ed. 2d 697 (1987). Accordingly, the district court actually decided the Motion to Dismiss in *Taylor* on the basis that § 922(g)(1) is facially unconstitutional in every circumstance.

### a. There Was No Basis for the Court to Grant Taylor's Motion on an As-applied Challenge.

The district court erred in *Taylor* by declaring § 922(g)(1) facially unconstitutional before conducting any meaningful "as-applied" analysis. Had the district court conducted a searching as-applied analysis, it would have had to deal with formidable persuasive precedent which establishes that Taylor could not successfully mount an as applied challenge on his particular facts.

The objectively neutral and undisputable facts were that Taylor had several prior felony convictions for battery, delivery of methamphetamine, possession of methamphetamine-production materials and reckless conduct. *See Taylor,* ECF 36, *Response to Motion to Dismiss* at 3. His most serious (and also his most recent) felony conviction was in *United States v. Taylor, et al,* no. 11-CR40029-JPG-3 (S.D. Il 2011), for which he initially received a sentence of 262 months. He was also on supervised release at the time of his § 922(g) offense. The fact that Taylor had sustained multiple, serious felony convictions rendered it necessary for the district court to analyze the particular facts in the case and distinguish it from those recent cases that hold that serious felony offenders cannot prevail on an as-applied challenge to § 922(g)(1). *See, e.g., Jackson*, 69 F.4th at 502.

Additionally, several courts, including many applying *Range's* holding, have held prior convictions for controlled substance trafficking are dangerous crimes which would withstand as-applied challenges to § 922(g)(1). *See e.g. United States v. Young*, No. 2:22-CR-20 JD, 2023 WL 8697936, at *3 (N.D. Ind. Dec. 15, 2023); *United States v. Ieliot Jackson*, No. 1:21-CR-175, 2023 WL 8601498, *13 (N.D. Ill. Dec. 12, 2023) (holding, in the alternative, the defendant would fail on an as-applied challenge to § 922(g)(1) given he had prior felony convictions for the dangerous offense of controlled substance trafficking) (collecting cases); *United States v. Wright*, No. 23-CR-336, 2023 WL 8237250, *6–7 (E.D. Pa. Nov. 27, 2023) (concluding § 922(g)(1) is constitutional as applied to felony drug traffickers under the standard articulated in Range); *United States v. Cooper*, No. 23-CR-004, 2023 WL 8186074, *5–6 (D. Del. Nov. 27, 2023) (same).

Furthermore, the Seventh Circuit has never actually upheld an "as applied" Second Amendment challenge to § 922(g) and has, in fact, "repeatedly rejected as-applied Second Amendment challenges" to that statute. *See Kanter*, 919 F.3d at 443. Certainly, the Seventh Circuit in *Kanter* noted that it "left room for as-applied challenges" to § 922(g). 919 F.3d at 443. But, to date, the Seventh Circuit has not sustained one.

In addition, the *Taylor* court failed to identify any historical evidence to support the proposition that the constitutionality of § 922(g)(1) turns on individualized assessments. This is a flaw that the *Atkinson* panel majority also noted:

> [A]lthough Atkinson has shown some support for the idea that a group's "dangerousness" is what mattered to the Founders, he does not provide much historical basis for individualized assessments or for delineating between individuals who committed violent versus non-violent crimes. The distinction is not an obvious consequence of many of the laws that Atkinson, and his amicus especially, discuss.

48

70 F.4th at 1023; *see also id.* ("Atkinson's historical analysis falls short."). Instead, as detailed extensively above, the historical tradition supports the legislature's ability to disarm *categories* of individuals. *See Atkinson*, 70 F.4th at 1035 (Wood, J., dissenting) ("since the founding, governments have been understood to have the power to single out categories of persons who will face total disarmament"); *Jackson*, 69 F.4th at 504 ("Legislatures historically prohibited possession by categories of persons . . . ."); *Kanter*, 919 F.3d at 464 (Barrett, J., dissenting) (disarmament "is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons"); *United States v. Booker*, 644 F.3d 12, 23 (1st Cir. 2011) (pre-*Bruen*, explaining that "the Second Amendment permits categorical regulation of gun possession by classes of persons . . . rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis"). The relevant question, in other words, is whether the status at issue indicates that the person cannot be trusted to use a gun responsibly, not whether each individual can be trusted to do so.[13]

The district court's approach in *Taylor* also ignored one of the *Atkinson* factors entirely, which set forth a necessary predicate inquiry for a district court in assessing an

---

[13] Individualized assessments could also yield wildly disparate results. *See, e.g., Atkinson*, 70 F.4th at 1027 (Wood, J., dissenting) (suggesting that enabling individuals to seek to establish a case-specific exemption from a generally applicable criminal law would create "an arbitrary patchwork of decisions—as far from the rule of law as one could image"); *United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011) (individualized exemptions would "obviously present serious problems of administration, consistency and fair warning"). And in the criminal context, in particular, the opportunity for pre-trial fact-finding is limited by Federal Rule of Criminal Procedure 12, which makes such as-applied challenges difficult to administer and resolve before trial if individualized facts, at least those relevant to the crime itself (like a § 922(g)(3) offense), are relevant. *See, e.g., United States v. Pope*, 613 F.3d 1255 (10th Cir. 2010) (Gorsuch, J.) (concluding that as-applied Second Amendment challenge to § 922(g)(9) could not be brought pre-trial because the defendant "contends the statute is unconstitutional only in light of the 'facts surrounding the commission of the alleged offense'—the very facts a court may not consider before trial" (citation omitted)); Fed. R. Crim. P. 12(b)(3) (limiting pretrial motions to motions that "can be determined without a trial on the merits").

as-applied challenge:

> 5. If history supports Atkinson's call for individualized assessments or for a distinction between violent and non-violent felonies, how do we define a non-violent or a non-dangerous felony? And what evidence can a court consider in assessing whether a particular felony conviction was violent? For instance, can a court consider the felony conviction itself, the facts of the underlying crime, or sentencing enhancements? *Bruen* shows that these distinctions should also have firm historical support. See 142 S. Ct. at 2132–33 (explaining that the court must assess whether modern and historical regulations are "relevantly similar," including in terms of how and why the regulations burden gun rights).

*Atkinson v. Garland*, 70 F.4th 1018, 1022-24 (7th Cur. 2023).

Had the district court in *Taylor* conducted an appropriate analysis of the as-applied question, it should have concluded that § 922(g)(1) is constitutional as-applied to Taylor based on his particular felony convictions.

### 2. The District Court in *Taylor* Erred in Granting Taylor's Motion on What is Essentially a Ruling that § 922(g) is Facially Unconstitutional.

The district court in *Taylor* essentially ruled that § 922(g) is facially unconstitutional. The district court reached this conclusion based on dubious rationales.

The court rejected the government's argument that Taylor is not a "law abiding, responsible citizen, "and is thus not among the people that the Second Amendment protects. The court found that the government's argument is based on Supreme Court dicta, which it did not have to follow. *Taylor*, ECF 44, *Memorandum and Order* at 7. The court then rejected the historical analogues the government presented because those historical laws it cited were "justified solely for discriminatory reasons" and thus "they cannot impose a 'comparably justified' burden on the right of armed self-defense." *Id. at 8*. Next, the district court found that the non-discriminatory historical laws the

50

government cited could not support the government's position because § 922(g) represents a lifetime ban on possession of firearms and the historical laws the government cited did not include life-time bans.  Finally, the district court rejected the government's reliance on Colonial-era laws that authorized capital punishment and estate forfeiture for convicted felons.  The court rejected this argument because: (1) the historical penalties were imposed for criminal conduct, not for "status crimes" like § 922(g)(1); and  (2) the fact that a statute authorized the death penalty and estate forfeiture did not necessarily mean the government could have taken a felon's firearms if it chose not to execute him or seize his estate. *Id.*

### a. The District Court Erred in *Taylor* When It Rejected Considered Supreme Court Dicta as Binding upon It.

The issue of the effect of Supreme Court dicta on lower courts did not arise in *Taylor* until the district court raised it sua sponte during the hearing on Taylor's Motion to Dismiss.  During that hearing, the government told the court that a district court in the Seventh Circuit is bound by "considered dicta" from the Supreme Court.  *Taylor* ECF 41 *Motion hearing Transcript* at 33-34.  While the parties had not briefed that issue, the government also provided the court with the name of the case that had first established that doctrine in the Seventh Circuit. *Id.* at 34.  Despite having the benefit of that authority, the district ultimately rejected the government's argument and relied on a case that had nothing to do with the effect of Supreme Court dicta on lower courts. *See Taylor*, ECF 44, *Memorandum and Order* at 7, *citing Cole Energy Dev. Co. v. Ingersoll-Rand Co.*, 8 F.3d 607, 609 (7th Cir. 1993).  The  district court erred in *Taylor* by dismissing the importance of the Supreme Court's "considered dicta.".

In the Seventh Circuit, the Supreme Court's "considered dicta" is generally binding upon the appellate court itself and on the lower courts within the Circuit. R*eich v. Continental Cas. Co.*, 33 F.3d 754, 757 (7th Cir. 1994). *See also United States v. Rice*, no. 3:22-CR-36 JD, 2023 WL 2560836, at *4 (N.D. Ind. Mar. 17, 2023); *Bembenek v. Donohoo*, 355 F. Supp. 2d 942, 950 (E.D. Wis. 2005). Because the Supreme Court has repeatedly asserted in considered dictum that the Second Amendment does not protect the right of felons to possess firearms, the district court was not free to just ignore those admonitions on the basis that they are merely dicta.

The Supreme Court's decision in *Bruen* is riddled with historical observations that would support the constitutionality of crime-based firearm restrictions. *Id*. at 2145-2162. While the Seventh Circuit's opinion in *Meza-Rodriguez* may not have defined "the people" under the Second Amendment, a trio of Supreme Court cases does provide a definition for that term in dicta. In *Heller,* the Court expressly rejected the notion that anything in their opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons ...." 554 U.S. at 626. Two years later, the Supreme Court reiterated those assurances in *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010). Most importantly, *Bruen*'s opening statement reaffirms the Second and Fourteenth Amendment right of an "*ordinary, law-abiding* citizen to possess a handgun in the home for self-protection" recognized in *Heller* and *McDonald*. 142 S. Ct. at 2122 (emphasis added). The notion is echoed many times throughout the *Bruen* opinion, including its concluding paragraph: "New York's proper-cause requirement violates the [Constitution] in that it prevents *law-abiding citizens* with ordinary self-defense needs from exercising their right to keep and bear arms." *Id*. at 2156 (emphasis added). The use

of the phrase "law-abiding" throughout the Supreme Court's three recent firearms opinions can hardly be termed casual or "non-considered."   The *Bruen* Court exercised great care in underscoring that the Second Amendment protects the rights of "law-abiding" citizens to keep and bear arms. The Supreme Court also made clear that it was reaffirming its prior holdings in *Heller* and *McDonald* which recognize that felons are not among "the people" entitled to bear arms. There is no avenue for the district court's conclusion that §922(g)(1), prohibiting Taylor's possession of a firearm as a felon (a non-law-abiding citizen), violates the Second Amendment even under *Bruen*'s new guidance. The Second Amendment's plain text does not protect the right of felons to possess firearms.

Furthermore, the Seventh Circuit has previously recognized the importance and guiding authority of the above-cited passages from *Heller* in defining the scope of the Second Amendment. In the pre-*Bruen* case of  *United States v. Skoien*, 614 F.3d 638, 640–41 (7th Cir. 2010) (en banc), the Seventh Circuit found that it was bound to respect the message conveyed by *Heller*'s language regarding longstanding, presumptively lawful restrictions. Specifically, the court found that these passages of *Heller* were instructions that "*some* categorical limits are proper," that those limits are part of the "original meaning" of the Second Amendment, and that filling in the details was to be left to the people's elected representatives. *Id.* Additionally, in an unpublished decision after *Bruen*, the Seventh Circuit rejected a facial challenge to § 922(g)(1) by a violent felon, in part by noting that the Supreme Court has declined to question the validity of laws barring felons from possessing firearms. *United States v. Gonzalez*, 2022 WL 4376074, *2 (7th Cir. Sept. 22, 2022) (unpublished). This recent decision, while unpublished, reflects that the Seventh

53

Circuit does not consider *Bruen* to have disturbed existing precedent on laws regulating felons who possess firearms.

Additionally, the district court in *Taylor* erroneously relied upon the Seventh Circuit's decision in *United States v. Meza-Rodriguez,* 798 F.3d 664 (7th Cir. 2015),  to conclude that felons are part of "the people" protected by the Second Amendment.  The district court failed to acknowledge or distinguish the arguments the government had raised at the motion hearing regarding the effect of *Meza Rodriguez*.  *See Taylor,* ECF 41, *Transcript of Motion Hearing* at 33-34.

In *Meza-Rodriguez*, the 7th Circuit explained that it was reluctant to place more weight on the *Heller* court's "passing references" to law abiding citizens  than the *Heller* Court itself did" and those passages did not, themselves, define the term "people." *Id.* at 669.  But as *Atkinson* later acknowledged, *Meza Rodriguez* was issued pre-*Bruen* and therefore did not have the benefit of *Bruen's* recurrent use of—not just "passing reference" to—the phrase "law-abiding citizens" to describe the scope of the Second Amendment. *See Atkinson*, 70 F.4th at 1023 (recognizing that although the Seventh Circuit in *Meza-Rodriguez* "analyzed the scope of the Second Amendment right before *Bruen*," it has "not returned to the issue since then"). Other district courts within the Seventh Circuit have made that same observation. *See United States v. Regalado*, No. 3:23-CR-42 DRL, 2023 WL 9054039, at *9 (N.D. Ind. Dec. 20, 2023) (collecting cases). The district court's order in *Taylor* does not analyze or attempt to reconcile *Atkinson's* cautionary language or any of these other authorities.

Accordingly, the Supreme Court's "considered dicta" indicates that felons are not among "the people" who are protected by the Second Amendment.  Pursuant to Seventh

Circuit doctrine, the district court in *Taylor* erred in dismissing those Supreme Court pronouncements as mere dicta which it was not bound to follow or even address.

**b. The District Court in *Taylor* Erred When It Rejected Valid Historical Analogues Sole1y on the Basis that they Were Discriminatory toward Groups that are Protected Today.**

The district court in *Taylor* erred when it dismissed the government's proffered historical analogues of laws that disallowed Catholics in England, Colonial-era Native Americans, and slaves from possessing firearms. The court rejected these analogues solely because those historical laws were "justified solely for discriminatory reasons" and thus "they cannot impose a 'comparably justified' burden on the right of armed self-defense." *Memorandum and Order* at 8. The district court offered no authority for its blanket rejection of those historical analogues and there is no requirement that a Colonial-era law has to be valid today to provide a historical analogue in a *Bruen* analysis. *Id.* The court ignored the fact that under *Bruen*, the relevant inquiry is why a given regulation, such as a ban based on one's status, was enacted and how that regulation was implemented. *Bruen*, 142 S. Ct. at 2133. No matter how repugnant and unlawful these bans are under contemporary standards, the Founders categorically disarmed the members of those groups because they viewed them as either dangerous or disloyal to the sovereign. *Range v. Att'y Gen.*, 53 F.4th 262, 273-82 (3d Cir. 2022) (per curiam) (collecting authorities), *vacated by* 56 F.4th 992 (3d Cir. 2023); *see also Jackson*, 69 F.4th at 502–03 (observing that the founding-era categorical prohibitions are relevant "in determining the historical understanding of the right to keep and bear arms").

While the district court in *Taylor* accurately noted that some of these categorical prohibitions would be impermissible today under other constitutional provisions, those

prohibitions are nevertheless relevant to understanding the historical scope of the right to keep and bear arms. *Jackson*, 69 F.4th 503; *see also Range*, 69 F.4th at 122 n.50 (Krause, J., dissenting) (rejecting these "bigoted and unconstitutional laws" but citing them to demonstrate the "tradition of categorical, status-based disarmaments"). Accordingly the district court in *Taylor* erred when it summarily rejected them.

### c. The District Court Erred when it Concluded that § 922(g)(1)'s Purported "Lifetime Ban" Rendered it Unconstitutional.

In his Motion to Dismiss, Taylor did not raise the issue of the purported effect of a convicted felon's "lifetime ban" from possessing firearms as bearing on the Second Amendment issue before the court. *See Taylor,* ECF 27 *et seq.* It was not an issue in *Taylor* until the district court raised it sua sponte during the hearing on Taylor's Motion to Dismiss. *See Taylor,* ECF 41, *Transcript of Motion Hearing* at 30-31. In response to the court's inquiry regarding whether a lifetime ban on felons possessing firearms was consistent with the history and tradition of the Second Amendment, the government argued that: (1) there is no lifetime ban pursuant to 18 U.S.C. § 925(c)'s restoration of gun rights provision[14], *Id.* at 40-42; (2) even if § 925(c) is unavailable, a convicted felon is still eligible to seek a pardon or executive clemency, *Id.* at 43; and (3) the historical analogues for felons relating to estate forfeiture and capital punishment demonstrate that at common law, a convicted felon could be dispossessed of everything he had, including his life, so dispossessing a convicted felon of his firearm was consistent with the notion that the government could take such a person's whole estate or even his life. *Id.* at 37. The

---

[14] The government also argued that the fact § 925(c) has not been implemented presents a due process, not a Second Amendment, issue. *Id*. at 40-42.

district court rejected these arguments.

It appears that the district court's primary reason for granting Taylor's motion to dismiss was due to its erroneous notion that § 922(g)(1)'s prohibition on firearms possession is invariably permanent.  The district court concluded that this fact rendered distinguishable the government's citation to "loyalty oath laws" in its response. In reaching this conclusion, the district court appeared to adopt the flawed rationale from *Prince* that was based on the erroneous conclusion that a current-day felon's right to possess firearms is invariably and irretrievably lost following a felony conviction while those who were deemed "untrustworthy" at common law could have their rights restored upon taking an oath.  *United States v. Prince*, No. 22 CR 240, 2023 WL 7220127, at *9 (N.D. Ill. Nov. 2, 2023) ("Conversely, loyalty oath laws, which are the strongest analogue to § 922(g)(1), allowed individuals deemed "untrustworthy" to regain their right to keep and bear arms by swearing an oath to a state or the United States, or by renouncing their faith. There is no similar opportunity under § 922(g)(1) for felons to regain their rights after demonstrating their ability to abide by the rule of law).

If the district court in *Taylor* was adopting the *Prince* rationale on lifetime dispossession, that reasoning is flawed because it strongly suggests that the district court was searching for a historical twin, not just a historical analogue, contrary to *Bruen*'s directives. *See Bruen*, 142 S. Ct. at 2122 ("[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*.").

Furthermore, § 922(g)(1) functions consistently with the historical analogues. Congress chose to disarm a group that has demonstrated disregard for the law and then

allows for restoration of the right to keep arms upon the requisite showing. Because that statutory scheme is "consistent with this Nation's historical tradition of firearm regulation," it comports with the Second Amendment. The district court's order in *Taylor* is based on the erroneous assumption that a modern-day felon's right to possess a firearm is irreversibly lost upon a felony conviction. Congress exempted from the federal felon-possession ban any offender whose conviction "has been expunged," who "has been pardoned," or who has had his "civil rights restored." 18 U.S.C. § 921(a)(20). *See also* 18 U.S.C. § 925. The district court erred when it erroneously held that § 922(g)(1) imposes a rigid life-time ban. It also erred in its apparent belief that the Second Amendment precludes Congress from imposing such a ban.

### d. The District Court in *Taylor* Erred When It Characterized § 922(g)(1) as Establishing a "Status Crime" and held that the Government's Proffered Historical Analogues were Thus Inapplicable.

The district court in *Taylor* erred when it rejected the government's reliance on Colonial-era laws that authorized capital punishment and estate forfeiture for convicted felons. The court rejected these arguments because the historical penalties were imposed for "criminal conduct; not for status crimes." *Taylor*, ECF 44, *Memorandum and Order* at 9. The Third Circuit made the same observation in *Range* when it noted: "government confiscation of the instruments of crime (or a convicted criminal's entire estate) differs from a status-based lifetime ban on firearm possession. *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 105 (3d Cir. 2023).

In rendering its status-crime based argument, the district court in *Taylor*, and the majority in *Range*, failed to credit or distinguish the voluminous authority that exists and that was cited in the government's response which establishes the proposition that

Colonial-era legislatures used status-based restrictions to disqualify whole categories of persons from possessing firearms.  They did so not merely based on an individual's demonstrated propensity for violence, but rather to address the threat purportedly posed by entire categories of people to an orderly society and compliance with its legal norms. *See United States v. Jackson,* 69 F.4th 495, 502 (8th Cir. 2023) ("History shows that the right to keep and bear arms was subject to restrictions that included prohibitions on possession by certain groups of people.")

Furthermore, it is difficult to fathom the logic behind the district court's (and *Range's*) rejection of the government's proffered historical analogues relating to felons being deprived of their lives or estate.  Under the cited Colonial-era laws, the implication of those laws was that a felon could be permanently deprived of his right to life and his right to his estate.  Similarly, the district court concluded (erroneously) that a convicted felon is permanently and irretrievably deprived of his right to possess a weapon under 922(g)(1).  While a Colonial-era defendant who had been deprived of his life could obviously not try to recover possession of same, a Colonial-era defendant who had been deprived of his estate could have obviously been prevented by the State from then-existing laws, from trying to recover his estate through non-legal means, such as surreptitious trespass or armed invasion.  In fact, the estate forfeiture aspect of Colonial-era felony laws was for perpetuity—a convicted felon's heirs were also dispossessed of any right to his estate. At common law, forfeiture  resulted in "corruption of the blood," which prevented the felon's heirs from inheriting or transmitting the offender's property. Richard E. Finneran & Steven K. Luther, *Criminal Forfeiture and the Sixth Amendment: The Role of the Jury at Common Law*, 35 Cardozo L. Rev. 1, 27 (2013); *Range v. Att'y Gen. United*

*States of Am.,* 69 F.4th 96, 127 (3d Cir. 2023).

"Forfeiture resulted at common law from conviction for felonies and treason." *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 682, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974). It "was a part, or at least a consequence, of the judgment of conviction" at common law. *The Palmyra*, 25 U.S. 12 Wheat. 1, 6 L.Ed. 531 (1827). The marker of a felony historically, according to Blackstone and the historical tradition among the States in early America, was forfeiture—the loss of property ownership. According to Blackstone, a felony "comprises every species of crime, which occasioned at common law the forfeiture of lands or goods." *See id.* at 94. It was a "total forfeiture." *Id.* at 95. *See also United States v. Regalado*, No. 3:23CR42 DRL, 2023 WL 9054039, at *3 (N.D. Ind. Dec. 20, 2023). Under early English law, the complete forfeiture of all real and personal property followed *as a consequence of conviction of a felony or treason*. In fact, the term "felony" was defined under English law as "an offence which occasions a total forfeiture of either lands or goods or both." 1 J. Bishop, Commentaries on the Criminal Law 382-83 (1856 ed.). See also *United States v. Grande*, 620 F.2d 1026, 1038 (4th Cir. 1980).

It is primarily because of this fact that estate forfeiture perhaps provides a more compelling rationale than capital punishment for firearm dispossession laws because felons at common law invariably forfeited their estates but not always their lives. In 1791 and thereafter, the prevailing and historical tradition was that someone convicted of a felony faced inevitable estate forfeiture, without the understanding that they would be entitled still to possess their firearms. *See Jackson*, 69 F.4th at 503-04 (quoting *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019)) ("it is difficult to conclude that the public, in 1791, would have understood someone facing [ ] estate forfeiture to be within the scope

of those entitled to possess arms"); *Folate v. Att'y Gen. of the United States*, 980 F.3d 897, 904-05 (3d Cir. 2020) (same).

Furthermore, it could be that the district court's unstated rationale was that Colonial-era felons who had their estates forfeited were not thereafter precluded from acquiring another estate just because of their felony status.  This would have been at least a facially valid observation, had the district court chosen to make it.  Because then it would follow that 922(g)(1) differs from common-law estate forfeiture because such a felon could possess another estate while a person convicted of a felony (according to the district court's erroneous conclusion) cannot possess another firearm after his conviction. This observation would have, however, only held superficial appeal because certain groups of Founding-era persons were permanently deprived of other substantial rights as a consequence of their status. As noted in the government's response, throughout the Revolutionary War, American legislatures passed numerous disarmament laws targeting those who failed to demonstrate loyalty to the emerging American government. *See Response to Motion to Dismiss* at 22. A common feature of these laws was to require oaths of loyalty to the government and to strip anyone who failed or refused to take the oath of the right to bear arms. *Id.  See, e.g.*, 1776 Mass. law at 479-80; 1776 R.I. law at 566-67; 1777 N.C. law at 229-31; 1777 Pa. law; at 111-13; 1777 Va. law at 281-82. Many of these laws provided that failing or refusing to take the oath resulted in forfeiture of a bundle of additional political rights, including the rights to vote, to serve on juries, and to hold public office—further reinforcing the longstanding connection between arms-bearing and these related rights, *see supra* at Section IV.A. *See, e.g.*, 1776 Mass. law at 481; 1777 N.C. law at 231; 1777 Pa. law at 112-13; 1777 Va. law at 282.

61

Similarly, felons could also be permanently disqualified from exercising these same civic rights because these rights belonged only to virtuous citizens. *See* Thomas M. Cooley, A Treatise on the  Constitutional Limitations 29 (1st ed. 1868) (explaining that certain classes of people were "almost universally excluded" from the franchise for "want of capacity or of moral fitness"); Saul Cornell, *"Don't Know Much About History" The Current Crisis in Second Amendment Scholarship*, 29 N. KY. L. REV. 657, 679 (2002) (identifying the "right to sit on juries" as "limited to those members of the polity who were deemed capable of exercising it in a virtuous manner

Finally,  the Supreme Court has upheld such deprivations against constitutional challenge. Committing a felony often results in the "forfeiture of a number of rights" tied to membership in the political community, including not just the right to bear arms but also "the right to serve on a jury and the fundamental right to vote." *See Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019) (citing 28 U.S.C. § 1865(b)(5), which bars convicted felons from serving on a federal jury; and *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974), which upheld state felon disenfranchisement); *see also Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998) (noting that consequences of a felony conviction can include deprivation of the right to hold office).

Designating 922(g)(1) as a "status" based prohibition is perhaps accurate but it is not at all dispositive of the question of whether historical analogues relating to capital punishment, estate forfeiture, or the deprivation of certain civic rights for convicted Colonial-era felons are relevant in determining the scope of a modern-day convicted felon's Second Amendment rights.

**e. The District Court in *Taylor* Erred when it Concluded that Colonial Era Laws that Imposed Capital Punishment or Estate Forfeiture are Meaningless in Assessing the Constitutionality of § 922(g)(1).**

The district court in *Taylor* erred when it held that the fact that Colonial-era statutes that authorized the death penalty and estate forfeiture for convicted felons did not necessarily mean the government could have taken a felon's firearms if it chose not to execute him or seize his estate. Once again, it is difficult to fathom the logic behind the district court's rejection of the government's proffered historical analogues relating to felons being deprived of their lives or estate. The court's reasoning fails to focus on the issue of what did the founders believe was *required by the Constitution*. This error is one that is repeated throughout the Second Amendment jurisprudence that has arisen in the aftermath of *Bruen*—an assumption that gives rise to the conclusion that whether or not the Founders conducted a particular regulatory act in relation to firearms was because they believed the Constitution required such action. The fact that Colonial-era law enforcement in a particular criminal's case may have operated to allow a convicted felon to retain his life, estate, or gun does not support a conclusion that it allowed him to keep any of those things because *it was Constitutionally required* that he be allowed to do so. Furthermore, the fact that Colonial-era authorities believed they *could* constitutionally claim a convicted felon's life, or permanently deprive him of his estate, both of which are rights otherwise protected in the Constitution, is strong evidence that they would have not have thought a less-onerous deprivation (possession of a firearm) raises constitutional concerns. *See e.g.*, Dru Stevenson, *In Defense of Felon-in-Possession Laws*, 43 Cardozo L. Rev. 1573, 1587 (2002) ("The framers could not have intended Second Amendment guarantees to apply to felons if, as a rule, all the felons were dead.").

63

## VI. CONCLUSION

For the reasons stated above, the Court should deny Defendant's Motion to Withdraw Guilty Plea and Dismiss Indictment.

Respectfully submitted,

RACHELLE AUD CROWE
United States Attorney

*Thomas E. Leggans*

THOMAS E. LEGGANS
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2024, I electronically filed the foregoing

document

## RESPONSE TO MOTION TO WITHDRAW PLEA AND DISMISS INDICTMENT

with the Clerk of Court using the CM/ECF system which will send notification of
such filing(s) to the following:

Counsel of Record

Respectfully submitted,

RACHELLE AUD CROWE
United States Attorney

*Thomas E. Leggans*

THOMAS E. LEGGANS
Assistant United States Attorney